IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA, 1884.

## Alexander *versus* The Commonwealth.

1. A foreigner resident in this country may be indicted under a name which is the English equivalent of his name in his native tongue, to which he had assented.

2. Where, upon an indictment for murder, there is a preliminary trial of an issue under a plea in abatement of misnomer, the defendant is not, on such preliminary trial, in jeopardy of his life or liberty, and it is discretionary with the Court whether or not to keep the jury secluded during the trial of such issue.

3. Affidavits in support of a motion in arrest of judgment are not part of the record.

4. In a criminal case the defendant is not in jeopardy until the whole jury is empannelled and sworn. Until all the jurors are sworn the Court may, for good cause, direct the drawing of the jurors to begin anew.

5. In a murder case, evidence having been admitted of the general reputation of the deceased for ferocity, the prisoner's counsel, in support of his theory that the killing was done in self-defence, offered to prove numerous specific acts of brutality and violence by the deceased, of which the prisoner had knowledge: *Held*, that evidence of such specific acts was not admissible.

6. When, in a murder case, the prisoner offered his own declarations for the purpose of explaining other declarations previously made by him, and given in evidence by the Commonwealth, the second set of declarations having been made an hour after the first, and at a place more than a mile distant from the place where the first declarations were

9 OUTERBRIDGE.—1.

made, *Held*, that the later declarations not having been substantially part of the same conversation, the offer was properly rejected.

7. A portion of a charge which, if taken by itself, might be exceptionable, may be deemed free of error because of the context.

8. The granting or refusing a new trial in a criminal case is a matter within the discretion of the Court below, and is not the subject of review on a writ of error. The fact that a principal reason assigned for a new trial was alleged misconduct of the jury, creates no exception to this rule.

9. On a motion for a new trial after a conviction of murder, it appeared, by depositions, that pending the trial after the conclusion of the testimony and before verdict, five of the jurors, in charge of a sworn officer, attended church on Sunday, where they heard a sermon on the text, "Thou shalt not kill." The sermon contained vehement language, exhorting juries to do their duty in murder cases, and blaming courts and juries for frequent dereliction in this respect. The Court refused to grant a new trial on this ground. *Held*, that the discretion of the Court below in refusing a new trial was not reviewable.

10. The Act of May 19, 1874 (P. L., 219), does not authorize the review by the Supreme Court, in criminal cases, of matters which had theretofore rested solely in the discretion of the Court below.

11. Laxity in departure from the rule requiring the seclusion of jurors pending the trial of murder cases, commented on.

January 7, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Oyer and Terminer of *Northampton county :* Of January Term 1884, No. 11.

Indictment of Sabato Alexander, alias "Jamie," for the murder of Pietro Phillippe, alias "Peter." The prisoner, when called for arraignment, pleaded in abatement that he was baptized by the name of Sabato D'Allessandro, and by that name has always since been called or known, and that he has never been called or known by the name of Sabato Alexander, or by the alias "Jamie," as in the indictment mentioned. Replication and issue on the plea in abatement. A jury was thereupon sworn to try that issue.

Several witnesses testified that the prisoner was known among his countrymen as Sabato D'Alessandro or Sabato Alexander, but was almost always called, in English, Jimmie or Jamie. A reporter who visited the prisoner in jail the day after his arrest testified that he admitted his name was Sabato Alexander. To a question put by the Court to the interpreter, "What is the Italian of Alexander?" he answered "Alessandro." This was objected to, but, subsequently, the question was asked the interpreter, without objection, "Is the Italian word D'Alessandro and an English word Alexander

the same?" to which he answered yes. The prisoner was sworn in his own behalf, and testified that his name was Sabato D'Alessandro. The defendant requested the Court to instruct the jury that under the law and the evidence the verdict should be for the defendant. Refused. (Second assignment of error.)

The court, MEYERS, P. J., charged the jury, *inter alia*: "It appears in evidence that the Italian for the name of Alexander is Alessandro, or D'Allessandro, and that the defendant, when he came to this country, assented to the use of his name as changed into English, and went by that name." (Third assignment of error.)

Verdict, on the issue under the plea in abatement, in favor of the Commonwealth.

The defendant's counsel moved in arrest of judgment on said verdict, and filed an affidavit in support thereof that while the trial on the plea in abatement was in progress the jury was allowed to separate at night and go to their respective homes, or where they pleased until they reassembled in court the next day, when their verdict was rendered. The court overruled the motion in arrest of judgment. (Fourth assignment of error.)

The prisoner on being arraigned stood mute, whereupon, by direction of the court, a plea of not guilty was entered for him. After eight jurors had been separately sworn and forty-nine names drawn, the box was found to contain no more names, though the venire called for sixty jurors, whose names had been put into the box by the clerk. The court then discharged the eight jurors already sworn, and ordered the clerk to put eleven paper pellets, containing the missing names into the box, and a jury was then drawn and sworn *de novo*. (Fifth assignment of error.)

The evidence in behalf of the Commonwealth was to the following effect: The prisoner and the deceased belonged to a gang of Italian laborers employed by the Delaware and Susquehanna Railroad Company to work upon their road-bed. They were all lodged in a house near Danielsville, in Lehigh Township, the second floor of which, consisting of two rooms, one back and one front, with stair passage between, was used for sleeping apartments. The first floor, similarly divided, was used generally as sitting-room, eating-room, store-room, kitchen, smoking-room, &c. On the evening of February 2d, 1883, the Italians, including the prisoner and the deceased, were gathered in the sitting-room or front room. Between eight and nine o'clock they at different times went up stairs and went to bed, the deceased being among the first to do so. The prisoner staid down stairs after all the others had gone

up, keeping a hatchet that was his property under a bench on which he was sitting. The occupants of the two upper rooms fell asleep somewhat after nine o'clock, as well as can be ascertained. At about half-past ten o'clock, when all the lights were out, the occupants of both rooms were aroused by the cry from the deceased: "Stoppa, Jimmie! Stoppa, Jimmie! · What's the matter with you?" Then followed groaning and lamentation from the deceased. No outcry was made by the prisoner, nor had he been heard to enter the upper room. Immediately upon the outcry one of the Italians went out to a neighbor's for a lamp, after which he went for their boss and sent for a doctor. After the outcry the deceased started from his bed, and after staggering a few steps, fell at the foot of the bed of another of the Italians, and lay there for some minutes, groaning, praying, and bleeding from eleven incised wounds. When the light came the deceased was found lying on the bed to which he had staggered. He had on his undershirt and his drawers, in which garments he had gone to bed—they were full of blood and cuts. The prisoner's hatchet, covered both as to metal and handle with blood, was found in the room of the deceased near the door. No other weapon of any kind whatever was found in the room after the assault. The bed of the deceased was broken down, the trestle at the foot of the bed was also broken, and lay under the wreck. The blanket was very bloody, and was cut in six, seven or more places. The sheet was cut in the same way as the blanket, and both the sheet and the blanket were bloody in the location of the cuts. When the light was brought the prisoner was not there, and his ordinary clothing had disappeared also. The outer door was wide open.

A messenger was sent for the boss, who arrived at about 11.30 P. M., and then went for a doctor. The doctor came at about 1 A. M. His opinion, on his arrival, was that the case was hopeless. The patient was almost pulseless, and the blood had ceased to flow from the wounds. He was carried to another bed where his wounds were washed and stimulants administered. At 9.30 A. M. on Saturday morning, Feb 3, 1883, he died. During the hours of the night and morning, with a thorough appreciation of his physical condition, and under an expressed apprehension of impending and speedy death, he declared that Sabato Alessandro was his murderer. To a question by the doctor attending him "who had done this," he answered " Jimmie. "

After the prisoner's flight he stopped at a country store, one mile southeast of the scene of the murder, at about eleven o'clock at night, at which place he wanted to get some clothing, but failed to do so. At six o'clock on the morning of

[Alexander v. The Commonwealth.]

February 3d, he was at a mill at Treichler's station, six or seven miles from the place of the homicide and on the line of the railroad to New York, dressed in the same clothing that he had on the evening before. He went to the railroad station just as a train for New York pulled up, and asked for a ticket to New York. The station agent told him he was too late to buy one for that train, and advised him to get on the train and pay the conductor, which however he did not do. He then inquired the time of the departure of the next train for New York, found that it was not till 11.40 A. M., bought a ticket and then, at about ten o'clock, left Triechler's, going up the railroad. He was pursued by some citizens, arrested at the house of a farmer, taken before a justice of the peace and thence taken under a commitment to the county jail. At Treichler's, in response to an inquiry, he said he had not had a fight, that he was going to New York and wanted some money changed. He offered his captors five dollars each to set him free, and said a good many things they did not understand. At the justice's office, upon being informed of the death of the deceased, he said: "No care," and upon being asked as to the weapon with which he had killed the deceased, he said: "A little axe." The justice told him he was charged with killing the deceased, and he said he did. He said, as the justice understood him, that he had lent the deceased money which he would not give back. At another time he said, as nearly as the witness could understand him: "You fightee me, I fightee you." Also, "Stealee my money, stealee my bread." The defendant had a wound in the palm of his hand apparently caused by a sharp instrument.

The principal theory of the defence was that a fight had occurred between the deceased and the defendant, and that the latter had acted in self defence.

Evidence of the general reputation of the deceased for brutality and violence having been admitted, the prisoner offered to follow this with evidence of numerous specific acts of brutality and violence committed by the deceased, to be followed by evidence that the prisoner had knowledge of such offences before the assault. Objected to by the Commonwealth. Objection sustained. (Sixth to sixteenth assignments of error, both inclusive.)

The Commonwealth having given in evidence the prisoner's declarations made in the office of the justice of the peace, the prisoner offered to prove declarations made by him afterward at a railroad station, for the purpose of explaining the former set of declarations. It appeared that the justice's office was about a mile and a half distant from the railroad station, and the latter set of declarations were made about an hour after

[Alexander *v.* The Commonwealth.]

the former. Objected to. Objection sustained. Exception. (Seventeenth and eighteenth assignments of error.)

The prisoner submitted, inter alia, the following points:

"If the facts as proven will support any reasonable theory consistent with the defendant's innocence, then the defendant must be acquitted." Affirmed.

The court, in its charge, held, inter alia, the following language: "If the Commonwealth has satisfied you that the defendant inflicted the wounds on the body of the deceased, and that he died from said wounds, then your next inquiry will be whether the Commonwealth has satisfied you beyond a reasonable doubt that the defendant is guilty of murder, and if so, of what degree, or of voluntary manslaughter." . . . .. . ["Where the defendant sets up the plea of self defence to an indictment for murder, he must satisfy you of the truth of that plea by the preponderance of testimony. If he failed to do so in this case, then he is guilty of murder of the first or of the second degree, or of voluntary manslaughter, as you find the facts may warrant."] That part of the charge which is quoted in brackets forms the subject of the nineteenth assignment of error.

Verdict of guilty of murder in the first degree. The prisoner moved in arrest of judgment, and obtained a rule nisi for a new trial. The motion in arrest of judgment was denied. (Twentieth assignment of error.)

The depositions in support of the motion for a new trial established the following facts: At the beginning of the trial two officers were specially sworn to take charge of the jury during the adjournments of the court. On several occasions during the progress of the trial the jurors were divided for the purpose of taking walks for exercise, some of them being in charge of one of the officers, and the rest being in charge of the other officer. On Sunday evening, June 12th, the testimony having been concluded, and the arguments of counsel begun on the previous day, five of the jurors, accompanied by one of the officers, attended church, and heard a sermon upon the text "Thou shalt not kill," in which the preacher used very vehement language, blaming courts, attorneys and juries for failure in duty in homicide cases, leading to frequent miscarriage of justice, and tending to incite to violence by mobs. It was not alleged that this sermon was prepared or delivered with reference to this trial, or that the preacher knew that any of the jurors intended to be or were present in church at the time.

The court refused to grant a new trial (twenty-first assignment of error), and sentence of death was pronounced. The prisoner then took this writ of error, assigning for error the several matters hereinbefore specified, and also the follow-

[Alexander v. The Commonwealth.]

ing (twenty-second assignment) : " The evidence fails to show the guilt of the prisoner, and he should have been acquitted."

*H. J. Reeder*, (with him *H. M. Hagerman* and *C. F. Walter*), for the plaintiff in error.—The court erred in permitting the jury to separate, and go where they pleased without any supervision, during the trial on the plea in abatement. While the prisoner was not directly in jeopardy, yet if the verdict were in his favor he could not be tried upon the indictment. It was of vital importance that he should be tried by his right name, or his life may be twice put in jeopardy for the same offence, and the policy of the law that the jury shall be kept secluded applies with equal force to this case as to the trial upon the indictment itself. But, however this may be, it was clear error to permit the jury to separate after the conclusion of the testimony on the main issue, and before verdict. The danger to the prisoner was aggravated by their listening to an inflammatory sermon exhorting juries to greater severity in the conviction of criminals accused of murder, and depicting in vivid language the terrible results of failure of justice in such cases. It is impossible to say that the jurors were not thereby improperly influenced to convict. That they might have been so influenced is sufficient reason for reversal of the judgment. If such language had been used to the five jurors in a street conversation, at that time, is there any doubt that the court would have discharged the jury, or have set aside the verdict ? The solemnity of the actual circumstances but adds to the force of our argument. It was, moreover, matter of common notoriety that but recently in the same county, a man accused of murder had been lynched by hanging by mob violence. The rule that juries in criminal cases shall be kept together in seclusion is well established in this state. Peiffer *v.* Commonwealth, 3 Harris, 468. The refusal of the court below to grant a new trial for ordinary causes (as *e. g.*, that the verdict is against the weight of the evidence) is not subject to review, but we contend that when the reason assigned is misconduct of the jury, the case is, from necessity, an exception. Otherwise, no matter how flagrant be such misconduct, if the court below misconstrues the law, the defendant has no redress. In such case the action of the court is an abuse of discretion, which is always reviewable. Whelchell *v.* State, 23 Ind., 89 ; Jack *v.* State, 26 Texas, 1. The Acts of March 31, 1860, February 15, 1870, and especially the Act of May 19, 1874, authorizing a defendant convicted of murder, after exceptions to " any decision of the court " to remove the " record and all proceedings " to the Supreme Court for review, afford ample warrant in such case.

Having shown the brutal and violent character of the deceased by evidence of his general reputation, our offer to show a series of specific acts of violence by the deceased, known to the defendant, should have been admitted. Wharton on Homicide, § 507, citing Commonwealth v. Seibert; Commonwealth v. Richmond, 6 W. N. C., 431, and note. Such proof is far stronger than mere general reputation. No case has decided that a series of specific acts may not be shown, and in the authorities cited where evidence of specific acts was excluded, it was not shown that the defendant had knowledge of them. We insist upon all the errors assigned, including that to the action of the court in discharging eight jurors after they had been sworn, and empanneling a jury de novo. The defendant was put in jeopardy the moment the first juror was sworn, and could not be again put in jeopardy. Wharton Cr. Practice and Pleading §§ 791, 492, 508. No malice or motive was shown for the killing, and the ingredients of murder were not proved.

*R. E. James* (*H. J. Steele* with him), for the defendant in error.

Mr. Justice TRUNKEY delivered the opinion of the court, March 3, 1884.

The defendant pleaded in abatement that he was baptized by the name of Sabato D'Allessandro, and by that name always since has been called or known. It was unnecessary to make the averment of his baptism, but having made it, the burden was on him to sustain it by proper evidence. He was permitted to give evidence that he had borne and used the name as if he had not alleged it was his baptismal name. The jury were instructed that it was incumbent upon the Commonwealth to satisfy them beyond a reasonable doubt that the real name of the defendant is that stated in the indictment; otherwise to render a verdict in his favor. The question was submitted whether in this country the defendant had assumed and assented to the name Sabato Alexander, and there was ample testimony in the affirmative. One witness directly asked him if that was his name, and he answered that it was. Complaint is made that the Court remarked in the charge, "It appears in evidence that the Italian for the name Alexander is Allessandro or D'Allessandro," and that there is no such testimony. But although objection was made when the Court asked the interpreter. "What is the Italian for Alexander?" subsequently the interpreter was called and sworn, and without objection to the form of the oath or to his testimony, he said that the Italian word D'Allessandro is the same as the English

word Alexander. The second and third assignments of error are not sustained—the first was not pressed.

A motion was made in arrest of judgment upon the verdict in the issue on the plea in abatement, upon the alleged ground that the jury were permitted to separate during the adjournment of the court. This does not appear of record—the affidavit of Mr. Walter is not a part of the record—and the refusal of the motion therefore is not subject to review. But we remark in passing that in the trial of that issue neither the life nor liberty of the defendant was in peril; the trial was to determine whether his true name was set forth in the indictment or in his plea, and we think it was entirely discretionary with the court below whether under the circumstances of the case there was good cause for keeping the jury secluded.

After the names of forty-nine jurors had been drawn from the box which had contained sixty, and eight jurors had been separately sworn, it appeared that eleven of the paper pellets had been clandestinely removed; whereupon the Court directed the clerk to prepare eleven pellets in place of those which had been removed, and again put all the pellets in the box; and further ordered that the drawing of the jury be commenced *de novo*. The defendant complains that the tendency of that order was to put him twice in jeopardy, and that the Court had no power to make it. He was not in jeopardy at the time of making the order. The trial begins when the jury is charged with the defendant, and that is at the moment a full jury is impanneled and sworn; he is not in jeopardy before. Up to that point the Court may postpone the trial as lawfully at one stage of the proceedings as another. A man is not in peril from the verdict of a jury till the full number are qualified to hearken unto the evidence and make deliverance. Eleven jurors, or eight, can give no verdict. McFadden v. Com., 23 Pa. St., 12. The practice as to the time of administering the oath to the jurors is not uniform; in some districts each juror is separately sworn as called and unchallenged, and in others none are sworn until all are selected. In either case the tribunal is unorganized while there are less than twelve, and until it is organized, for good cause the Court may direct the drawing of the jurors to begin anew.

With some doubt as to the sufficiency of proof that the deceased had assaulted the defendant, the Court admitted evidence of the reputation of the deceased for brutality, vindictiveness and violence. An offer was made to follow this with evidence that the deceased had committed divers crimes, involving a ferocious and cruel disposition on his part, and that before he was killed the defendant had knowledge of said offences. No precedent has been cited for the proof of such

[Alexander *v.* The Commonwealth.]

acts by the deceased in his lifetime, nor does there seem to be reason for their investigation where they are not in issue. Conceding that the defendant had proved that he was attacked by the deceased, then it was competent to prove his blood-thirsty character, his bodily strength, how he was armed, the manner of the assault and all other circumstances tending to show that the attack was felonious, or that it was believed to be felonious by the defendant. But it is settled that specific criminal acts at other times, affecting other people than the slayer, which may have given the deceased his bad character, are incompetent. Were evidence of such acts competent, so would be repelling evidence, and the side issues would become as numerous as the offences charged against the deceased. The offer to prove "a series of five specific acts of violence known to the defendant," meant an investigation of each act as plainly as did the separate offers to prove each.

The Commonwealth gave evidence of the defendant's declarations made in the office of Justice Hower. For the purpose of explaining these the defendant proposed to prove his declarations, made more than an hour afterwards, and a mile and a half distant from Hower's office. Instead of showing that his offer was part of a continuous conversation began at the office of Justice Hower, the evidence shows the contrary. Its rejection was clearly right.

The nineteenth assignment of error is to the following portion of the charge : " Where the defendant sets up the plea of self-defence to an indictment of murder, he must satisfy you of the truth of the plea by the preponderance of testimony. If he failed to do so in this case, then he is guilty of murder in the first or of the second degree, or of voluntary manslaughter, as you find the facts may warrant."

This, if exceptionable by itself, with the context is free of error. In the instructions every point put by the defendant's counsel was affirmed, and the facts submitted with fairness to him. The jury were told, " If the facts, as proven will support any reasonable theory consistent with the defendant's innocence, then the defendant must be acquitted." Also, " If the Commonwealth has satisfied you that the defendant inflicted the wounds on the body of the deceased, and that he died from said wounds, then your next inquiry will be whether the Commonweath has satisfied you beyond a reasonable doubt that the defendant is guilty of murder, and if so, of what degree, or of voluntary manslaughter." Then the jury understood from the remark objected to, that if the defendant killed the deceased, and the killing was not in self-defence, he was guilty either of murder or voluntary man-

slaughter. The evidence admits of no other conclusion; or, really, there was no evidence that the killing was involuntary.

Under the last assignment it was argued that there was not evidence of the existence of the ingredients necessary to constitute murder in the first degree. The evidence is too strong for doubt, that the deceased at the moment of the assault was in his own bed, and all the other occupants of the room were in theirs, except the defendant; that none heard the defendant come into the room, and it was dark; that with his own hatchet he inflicted the numerous wounds upon the head and upper part of the body of the deceased; that the defendant was not heard to make outcry, and received no injury unless a slight cut on the hand, which healed within a few days; and that the deceased cried, "Stoppa, Jimmie! Stoppa, Jimmie! What is the matter with you?" and he was unarmed. The legitimate inference, we think, is not weakened, but strengthened, by other facts in evidence. When a man quietly approaches another's bed in the night, and makes a furious assault with a deadly weapon, it is presumed that he intends the natural consequences of his act. If the jury believed the testimony they rightly found that the killing was wilful, deliberate and premeditated.

The assignment that the Court erred in refusing to arrest judgment was not pressed, for the obvious reason that no ground for the arrest appears of record. But it was urged that the Court erred in denying the motion for a new trial because the jury were allowed to separate and part of them, attending church, heard a sermon on the text, "Thou shalt not kill."

At common law the refusal to grant a motion for new trial being a matter of discretion, is no ground for a writ of error. The Act of May 19, 1874, provides that on the trial of all cases exclusively triable in the Courts of Oyer and Terminer, "exceptions to any decision of the Court may be made by the defendant, and a bill thereof shall be sealed in the same manner as is provided and practiced in civil cases; and the accused after conviction and sentence, may remove the indictment, record and all proceedings to the Supreme Court." It is contended that as any decision of the Court may be excepted to, and all proceedings may be removed, the refusal to grant a new trial may be reviewed. Previously it had been enacted that in all cases of murder in the first degree removed to the Supreme Court, the judges shall review both the law and the evidence, and determine whether the ingredients necessary to constitute murder in the first degree were proved to exist; the Act of 1874 enables this to be done by providing for the removal of all proceedings. But it was not the intendment

[Alexander *v.* The Commonwealth.]

that decisions which have always rested in the sole discretion of the Court where the cause was tried, should be made subject to exception and review. If this were so the accused could except to the refusal of his motion to postpone the trial, or to the granting of a motion by the Commonwealth for continuance, or to the refusal of his application for attachment for an absent witness, and the like, as well as to the refusal of his motion for new trial. The decisions subject to exception within the purview of the statute are similar to such as were so subject on the trial of a civil cause, as the admission or rejection of testimony and instructions to the jury. This is plainly expressed in the statute, and like plainness is requisite to overcome the rule at common law that decisions of matters within the discretion of the Court are not subject to writ of error.

In this case we think there is little reason for regret that the refusal of a new trial is final. On its trial every doubtful question was solved in favor of the defendant. His claim that he struck in self-defence was submitted with fair instructions, although the evidence thereof was slight, if any at all. The learned judge recognized that, " It is undoubtedly the law of this State that on trials for homicide, jurors ought not to be permitted to separate while the prisoner is in their charge ; " and he believed this rule had been complied with, at least in its spirit. Upon careful consideration he concluded that the sermon (not a fragment of it) neither had nor tended to have the effect of biasing the minds of the jurors or of disqualifying them for the proper exercise of their functions; and in this view he was likely correct.

There is a growing laxity in the observance of the rule which, if unchecked by the Courts of Oyer and Terminer, may induce legislation either abrogating the rule itself, or providing a remedy when it shall not have been enforced. It seems to us that compliance with the rule ought to be so strict that no plausible charge could be made that the jury were not kept free from every improper communication or intrusion. Increasing the number of subjects for review in homicide cases is detrimental to the public, and departure from old and familiar rules strongly tends to promote such increase. There was much appearance of departure in this case from an undoubted rule, and it is not strange that the learned and able counsel for the defendant have sought, for that cause, to obtain another trial.

> The judgment of the Court of Oyer and Terminer of Northampton County is affirmed, and it is ordered that the record be remitted to said court that the sentence may be executed.