## Commonwealth v. Weisel.

*Criminal law—Murder—Change of venue—Prejudice against defendant—New trial—Private counsel for Commonwealth—Evidence—Jury.*

1. Where a defendant has been convicted of murder of the first degree, but without the death penalty, the court will not entertain as ground for a new trial a refusal of change of *venue* where all the members of the court were of the opinion before the trial that the public mind was not inflamed against the defendant, and the subsequent developments down to and including the verdict have satisfied them that their original opinion was right.

2. In such case, the omission of the death penalty indicates no extreme feeling against the defendant.

3. It is within the discretion of the court to permit private counsel to assist the Commonwealth in the trial of an indictment for murder.

4. The fact that such counsel did not appear until after a number of the jurors had been chosen is immaterial.

5. A juror may be challenged after selection and before the jury is completed and sworn.

6. It is within the discretion of the court to permit a witness to be examined in redirect examination as to conversations with the defendant in a murder trial.

7. On the trial of an indictment for wife murder, it is competent, in order to show motive, to permit a woman to testify that she had improper relations with the defendant.

8. A new trial will not be granted after a conviction of murder because, on a Sunday evening during the course of the trial, the court crier in charge of the tipstaves, a Sunday school teacher, talked with the jury on the Sunday school lesson of the day, without referring in any way to the trial.

Motion for new trial. O. and T. Fayette Co., Sept. T., 1926, No. 7.

Before Hudson, P. J., and Morrow, J.

*E. D. Brown*, District Attorney, *W. K. Newell*, First Assistant District Attorney, and *Charles F. Uhl*, of Somerset County, for Commonwealth.

*A. E. Jones, H. S. Dumbauld;* and *P. K. Shaner*, of Westmoreland County, for defendant.

MORROW, J., Jan. 19, 1927.—The defendant was charged with the murder of his wife and the jury found him guilty of murder in the first degree, with penalty of life imprisonment fixed in the verdict. The matter is now before us on a motion for a new trial. The first reason assigned in the original motion is that the verdict is against the weight of the evidence. In considering this reason we will briefly review the evidence.

The defendant and his wife, with their two children, a boy aged thirteen and a girl aged ten, lived at Pennsville, this county, in a house of eight rooms, four on each floor. On the second floor there was a hallway, with two rooms on the south side thereof and two on the north. At the rear end of this hall was a bath-room. At the head of the stairs and on the north side of the hall was a door leading into the bedroom occupied by Mrs. Weisel. Just opposite was the door leading into the bedroom occupied by the defendant. He and his wife had occupied separate bedrooms for two or three years prior to her death. From Mrs. Weisel's bedroom a door opened into the rear room on the same side of the hall. This was the only door into this rear room, there being none from the hallway. One of the windows of this rear room was over the back porch roof.

On the night of July 5th last Mrs. Weisel and the two children went to bed as usual, she fastening her bedroom door on the inside by means of a hook. This night the little boy, instead of occupying the rear room, slept with his mother. The little girl slept in a small bed near her mother's bed. The window over the back porch roof in the rear room was open. Between half-

past two and three o'clock in the morning a neighbor, Edward Ullery, was awakened by a rapping on his door, and on going to the door found the defendant and his little boy there. The defendant told him that they had been all shot up and asked him to come over. He went with the defendant and found the house in darkness. Things were disarranged downstairs, giving a first impression that the house had been ransacked. Using flashlights, they went down cellar at the defendant's suggestion and looked around before going upstairs. On reaching the upstairs, the defendant led the way to the electric light box, put in a fuse that had been pulled out and left lying in the box, then pushed in the switch, after which the light came on. They then went to Mrs. Weisel's room and found her lying in bed with life extinct. There was a bullet wound in her left temple and another in her left chest, with much blood on the bedclothing and her night-gown. The little girl was still sleeping. The coroner's examination revealed that the one bullet had passed through the head and the other through the body of Mrs. Weisel, both entering the bed, and that either would have caused her instant death. The location of the wounds caused by the exit of the bullets and the location of the two holes made by the bullets in the bedding made it clear that she had not moved between shots. Everything indicated that she had been shot as she lay there asleep.

Further examination revealed that two shots had been fired from the hallway into the defendant's bedroom, one passing through the door and the other through the casing, and that two other shots were fired either from the hallway or in this room, the one lodging in the wall thereof near the side window and the other in a strip of wood at the side of the fire-place. In addition, two shots had been fired from inside the defendant's bedroom through the wall and into the hallway. The defendant's explanation that morning of what occurred was along the same line as his testimony at the trial, and to the effect that the person who must have shot his wife came out into the hall and, his bedroom door being partly open, fired the four shots mentioned into his room, and that he immediately fired from his rifle two bullets through the wall into the hallway, then pulled on his pants and slippers, took his revolver and started downstairs after the intruder, followed by his little boy, Robert; that he went out on the back porch and fired six shots into the ground to raise an alarm; that Robert went back upstairs and called to him that something was wrong, and he then went to his wife's bedroom and found her covered with blood and dead; and that after this he and Robert went to the residence of Mr. Ullery.

Three empty revolver shells were found on the back porch and one on the ground nearby. A day or so later six empty revolver shells were found under the tub in the bath-room. All of these empty shells were of the same size and kind as used by the defendant in his revolver.

According to the testimony of the little boy, Robert, he and his mother and his little sister went to bed about eleven o'clock, his mother hooking the bedroom door on the inside. He slept with his mother, and his sister occupied a small bed nearby. Between two and three o'clock in the morning he heard two shots and covered up his head. Soon he heard more shooting, after which, his head still covered, he heard one or more go downstairs. He then went to the window, thinking it might have been some one firing torpedoes. After going to the window, he tried to turn on the light, but none came, and he got back into bed. Soon after he looked out the bedroom door, which was open, and saw his father, the defendant, on the third or fourth step of the stairway. He went to his father and told him something had happened to his mother.

He did not remember the reply his father made. They then went downstairs and with the aid of a flashlight looked around, went out on the back porch, where his father fired some shots into the ground, and then went upstairs to his mother's room, still using the flashlight. His father stood in the room near the bed and said: "This is awful." He then went with his father to the Ullery residence.

That morning, after the officers made an investigation, the defendant was taken by them to Uniontown and during the day was detained at the county detective's office. In the evening, in the presence of five officers, including the coroner, he was questioned, first being advised that anything he might say would be used against him. For a time he insisted that some unknown person had gotten into the house and had shot his wife and had fired the four shots into his room. He was asked about his relations with a young woman, Nora Hough, and he insisted that there had been nothing improper between them. Later, he was advised that she had made a statement to the effect that illicit relations had existed between them. He then admitted that this was true and expressed a willingness to make a statement if her name were kept out of the whole matter. The coroner cautioned him to be careful what he said, and offered to get him an attorney. He replied, that he did not want counsel that night, but to send an attorney in the morning to take care of his business affairs and his children. Much more was said, but they finally went into another room, where he and the county detective prepared a statement, he dictating and the officer typewriting it. He signed the statement in the presence of the five officers, who witnessed his signature. The statement does not mention Nora Hough. In this statement he says, amongst other things, that he disarranged things in the house to give the appearance of burglars having been therein; took his revolver, a 38 Special Colt, went through a window onto the back porch roof, walked across the roof to the window in the little boy's room adjoining that occupied by his wife, entered through this window, disarranged the dresser drawers, went on into his wife's room, located her in the bed by the use of his flashlight, and shot her twice as she lay there in bed, then unlatched her door, entered the hall, fired two or three shots from his revolver, after which he got his rifle and with it fired through the wall, then went downstairs, and as he reached the foot of the stairs his little boy called to him that there was something wrong with mother, to which he replied, "I hope not," and went back up and into her room, where he found that she was dead, and he then knew that he had accomplished what he had set out to do; that he and the boy then went downstairs and out on the back porch, where he fired five or six shots into the ground, having reloaded the revolver before coming downstairs; that they went to Ullery's and told him what had happened; that Ullery returned with him and they looked around the house, then Ullery went for an undertaker; and that when the officers arrived he told them a story about some one being in the house and shooting at him, which was not true, he having arranged the whole affair to look as though robbers had been in the house. This statement was admitted in evidence. The defendant in his testimony at the trial said that this confession was not true and that he had been led to make the same by a promise that the name of Nora Hough would be kept out of the case.

Nora Hough testified to having had illicit relations with the defendant, and he admitted this to be true. They had been associated in a business venture, which was for a time conducted from his home, one of the front rooms downstairs being used for an office, and he admitted that at times he had had improper relations with her upstairs in his own home. The jury was clearly

Commonwealth v. Weisel.

instructed that unless they should find from the evidence beyond a reasonable doubt that such conduct and relationship between them was a motive for the commission of the crime charged, they should not consider same upon the question of the defendant's guilt or innocence of the crime charged against him.

For the purpose of proving that the two bullets causing the death of the defendant's wife were fired from his revolver, the Commonwealth called two witnesses, Seth Wiard and Major Calvin H. Goddard, having special or expert knowledge as to firearms. After explaining how he arrived at his conclusions, Major Goddard gave it as his opinion that the two bullets, the one passing through the head and the other passing through the body of Mrs. Weisel, and the bullet taken from the defendant's bed and the bullet found imbedded in the wall of his room, were all fired from the defendant's revolver. He also testified that, in his opinion, the ten empty revolver cartridges before mentioned were all fired from the defendant's revolver. He gave reasons for the opinions expressed that were not weakened by cross-examination.

Considering all the testimony introduced, many questions may have arisen in the minds of the jurors that they could not answer on any theory consistent with the defendant's innocence. For instance:

Why did the defendant, if not guilty, make a complete confession in less than twenty-four hours after his wife's death, wherein he admitted killing her, explaining in detail how he did so, he not having been subjected to any physical mistreatment whatsoever to force a confession from him?

Would and did the defendant falsely acknowledge himself guilty of a brutal and fiendish crime, the murder of his wife, to protect a paramour?

Would a burglar have shot this woman while she lay in bed asleep?

Would a burglar afterwards have crossed the hall and shot at random into the defendant's room?

Was it reasonable to believe that the defendant ran downstairs in the dark in close pursuit of a burglar or other intruder whom he knew to be armed?

Would an innocent father have left his little girl lying asleep alone in the same room with her murdered mother, saturated in blood and not yet cold in death, while he went for a neighbor, returned with him and examined the cellar and other parts of the house, before going to the room where lay his dead wife and sleeping child, and this, according to the neighbor, without even having told him that his wife had been murdered?

What motive or reason would have prompted any one else to murder this good and faithful wife and mother in the stillness of night while she was peacefully sleeping in her home with her two children by her side?

The reason assigned for a new trial, that the verdict is against the weight of the evidence, and likewise the second reason, that the verdict is against the law, cannot be sustained. It is not apparent how, under the evidence and the law, the jury could have done other than find the defendant guilty of murder in the first degree.

The third, fourth and fifth reasons stated in the original motion for a new trial are general and have been included in and covered by the twenty-seven reasons filed Dec. 17, 1926. To these we will now turn.

The first, second and fourth reasons relate to the refusal of motions for change of venue. At the argument on the motion for a new trial these reasons were not stressed. The fact that the jury, under the evidence above mentioned, did not in its verdict fix the death penalty is satisfying evidence that it was not influenced against the defendant by passion or prejudice, which his counsel professed to fear existed so generally that the defendant

could not have a fair trial. At the trial, liberality was shown the defence in the examination of jurors and in the matter of sustaining challenges for cause when they professed having opinions. And yet many more jurors disqualified in this case on the ground of having conscientious scruples against the imposition of the death penalty. When the original motion for change of venue was made as the trial was about to begin, all the members of this court were of the opinion that the public mind was not inflamed against the defendant as alleged, and the subsequent developments down to and including the verdict of the jury have satisfied us that this opinion of the court was right. In urging the allowance of the motion, the reasons emphasized were that certain newspapers had published articles to the effect that the defendant had made a confession admitting his guilt and that he had had illicit relations with Nora Hough. Undisputed evidence showing all this was actually submitted to the jury at the trial under instructions not assigned as error. If the defendant and his counsel really felt that these reasons were sufficient to warrant a change of venue, they must have actually believed that the mere reading of newspaper reports of the matters mentioned would inflame the minds of the readers against the defendant. However, it developed, as above mentioned, that these same matters were competent testimony against the defendant, and, as such, were legally introduced in evidence at the trial, and yet the jury did not fix the extreme penalty in its verdict. The recollection of all this dissipates any seeming merit to the contention that a jury not prejudiced against the defendant could not be secured in this county.

The third reason pertains to the action of the court in allowing Charles F. Uhl, Esq., of the Somerset County Bar, to assist the district attorney in the trial of this case. This was a matter within the discretion of the trial judge: Com. v. Eisenhower, 181 Pa. 470; 22 Ruling Case Law, § 7, page 93. It appears not to have been known even by Mr. Uhl himself that there would be a desire to have him thus assist at the trial, until after ten of the jurors had been chosen. Counsel for the defence urged that they might have challenged differently in selecting these ten jurors had they known that Mr. Uhl was to assist the district attorney. Nothing specific as to different action was then suggested. It was purely speculative. However, the district attorney stated that Mr. Uhl did not know any of the jurors chosen, and further agreed that they could be examined as to their acquaintanceship with him, and that if such examination revealed that any of them did know him, then such juror or jurors would be excused if the defence so desired. Counsel for the defendant, seeming to take the position that a juror once accepted could not afterwards be excused even by agreement, declined to interrogate the jurors. That a juror may even be challenged after selection and before the jury is completed and sworn is the law: Com. v. Curry, 287 Pa. 553. It is not now even suggested that any juror knew Mr. Uhl or that his presence and assistance at the trial prejudiced any right of the defendant. His conduct throughout the trial was quiet and dignified, and all his actions indicated wide experience and high ideals. He was careful at all times not to press for a ruling in favor of the Commonwealth if its right thereto seemed doubtful.

Nothing was advanced at the argument indicating that the fifth and sixth reasons merit any consideration.

The seventh, eighth and ninth reasons relate to allowance of certain redirect examination of the witness A. W. Bell, Jr., concerning conversations with the defendant. This was a matter within the discretion of the court. He and other officers had talked with the defendant for a considerable period in one room, then they went to another room, where the defendant's confession was

Commonwealth v. Weisel.

dictated, typewritten and signed. When Mr. Bell first testified concerning the confession, the Commonwealth confined its examination on that point, for the most part, to what took place in this second room where the confession was signed. The witness made it clear that there was prior conversation. On cross-examination of the next witness, Dr. Baltz, the defence chose to go into the matter of this conversation between the defendant and the officers in the first room and was allowed by the court to do so. The other officers likewise told of the interview in the first room, and Mr. Bell was recalled by the Commonwealth to testify concerning this same interview with the defendant. To have excluded his testimony might have given the jury an erroneous impression. As the situation developed, we think that sustaining the objection to this testimony would not have been a proper exercise of discretion.

The tenth reason concerns the admission in evidence of the written confession signed by the defendant. The law, as we understand it, applied to the evidence in this case, made its admission imperative. It then became the duty of the court to instruct the jury concerning same. Instructions were given covering also the question of collateral inducements as explained in Com. v. Wilson, 186 Pa. 1, and Com. v. Volkavitch, 5 Kulp, 75.

The eleventh and twelfth reasons relate to the testimony of Nora Hough. This testimony was competent on the question of motive: State v. Legg, 53 S. E. Repr. 545, 549. The jury was instructed, as hereinbefore mentioned, concerning the purpose of this testimony and the consideration to be given thereto.

The thirteenth to the twenty-first, inclusive, and the twenty-fifth and twenty-sixth reasons assigned for a new trial were not pressed at the argument, and we see nothing in any of them calling for discussion here. Likewise, the twenty-second and twenty-third reasons, alleging error in overruling objections to certain questions asked the defendant on cross-examination, need little comment. The question recited in the twenty-second reason is not quoted exactly as it appears in the record, and the answers made by the defendant to both of the questions show that he was in no way confused or injured by either their form or substance.

The twenty-fourth reason alleges error in refusing to strike out the testimony of Major Goddard. This testimony and the exhibits produced by this witness were received in evidence without objection or exception, and the witness was cross-examined at great length by counsel for the defence. On what theory or for what reason this testimony should have been stricken from the record does not appear.

From the last reason and the testimony in support thereof, taken at the time of the argument with the consent of the district attorney, it appears that about seven o'clock Sunday evening, Oct. 17, 1926, while the jury were in Court Room No. 4, a small room on the third floor of the court-house, where they were spending the evening in the custody of the tipstaves, Mr. Cooke, the court crier, came in. It may be inserted by way of explanation that in practice he is considered the officer next superior to the tipstaves, and it is generally he who designates which of the tipstaves shall be in attendance upon a particular jury, seeing that such work is fairly apportioned among them. Mr. Cooke is a Sunday school teacher of recognized ability, and when he came in it seems to have been suggested that he give a talk on the Sunday school lesson for that day. The lesson was about Moses, and he did talk in the presence of the jury for some ten or fifteen minutes on that subject. No reference whatever was made by him to the case on trial. It was not shown or urged that he said anything that in any way injured the defendant or

Commonwealth *v.* Weisel.

prejudiced his rights. It certainly never occurred to him that there could be any objection to his talking for a few moments on the Sunday school lesson to this jury, doubtless wearied by long confinement, else he would not have done so. His action does not warrant a new trial: Alexander *v.* Com, 105 Pa. 1.

We have carefully considered all the reasons assigned for a new trial and are of the opinion that none of them can be sustained. Able counsel for the defendant saw that no right to which he was entitled under the law was overlooked. Great care was exercised in the selection of a jury, in the examination of witnesses and in the introduction of exhibits. His cause was eloquently presented to the jury. More he could not ask or expect. No reason has been suggested for believing that another trial would result in a verdict more favorable to the defendant.

*Order.*

And now, Jan. 17, 1927, after consideration, the motion for a new trial is refused.

From Luke H. Frasher, Uniontown, Pa.