## Commonwealth of Pennsylvania *v.* Joseph Keller, Appellant.

*Criminal law—Murder—Threats—Uncommunicated threats—Charge of the court.*

On the trial of an indictment for murder, proof of uncommunicated threats made by the deceased may be received as tending to show his motive and intention, and thus giving rise to an inference that in the fatal encounter he was the aggressor.

*Criminal law—Murder—Evidence—Photograph of the deceased.*

On the trial of an indictment for murder a full length photograph of the deceased is admissible to rebut testimony that the prisoner was a smaller man than the deceased, where the witness who identifies the photograph and testifies to its accuracy is represented in it, standing by the side of the deceased.

*Criminal law—Murder—Evidence—Witness.*

On a murder trial where the district attorney has called a large number of witnesses to the occurrence, it is not error for the court to refuse to direct him to call a witness whose name was on the bill of indictment, where it appears that the testimony of such witness would have been merely cumulative as to the occurrence.

Argued Feb. 23, 1899. Appeal, No. 414, Jan. T., 1898, by defendant, from judgment of O. and T. Lackawanna Co., Oct. T., 1898, No. 24, on a trial of indictment for murder. Before STERRETT, C. J., GREEN, MITCHELL and FELL, JJ. Affirmed.

Indictment for murder. Before EDWARDS, J.

At the trial it appeared that on July 31, 1898, the prisoner killed Peters Meyers by shooting him with a pistol. There was evidence that there had been a previous quarrel between the men, and that they had made threats against each other. Some of the threats made by the deceased had been communicated to the prisoner, and some had not.

After the commonwealth had called sixteen witnesses to the occurrence and had rested, counsel for the prisoner made the following request:

"We ask (the evidence in this case disclosing the fact that Lown was an eye-witness to this shooting) that the commonwealth be required to produce him as a witness in this case."

The district attorney replied that he had called all the eye-witnesses to this affair; that it is discretionary with the district attorney as to what witnesses he shall call in making out the case of the commonwealth; that there is no compulsion to call all the eye-witnesses in a homicide case, and that it is within the knowledge of the district attorney that the witness referred to is an adverse witness to the commonwealth.

The Court: Under the circumstances and the testimony referred to being necessarily cumulative I will decline to direct commonwealth to have the witness mentioned sworn.

Exception noted for the defendant, at whose request a bill is sealed. [4]

The commonwealth offered in evidence three photographs of Meyers, for the purpose of showing by way of rebuttal that there was not the disparity between the size and weight of the defendant and the deceased, it having been shown that the pictures are the pictures of the deceased by several of the defendant's own witnesses.

The offer was objected to as being incompetent, the pictures not being sufficiently identified for the purpose for which they are offered, and there being no evidence showing when they were taken or whether they were a likeness of the deceased at the time of the killing, and are incompetent for the purpose offered.

The Court: There is only one part of the objection that is good.

Mr. Jones, district attorney: I will call a witness on that point.

Phillipena Bender recalled for commonwealth, testified as follows:

Mr. Jones: "Q. Who does that picture represent? (Commonwealth's exhibit 'No. 1' shown witness.)   A. Mr. Meyers. Q. And yourself?   A. Yes, sir.   Q. When was that photograph taken?   A. I couldn't say.   Q. Well about?   A. About five

months after he got killed? Q. It couldn't be taken five months after he got killed? A. Five months before, I should say. Q. Before he was shot? A. Yes, sir. Q. Is that a true likeness of him? A. Yes, sir."

Mr. Jones : "Was there any change in his physical condition in regard to weight or otherwise to your knowledge, since the taking of the picture up to the time of his death?"

Mr. Scragg, of counsel for defendant: We object to the question as being incompetent and improper.

The Court: The objection is overruled; exception noted for the defendant at whose request a bill is sealed.

Mr. Jones : " Q. Did he remain about the same? A. No, sir, he got thinner, he didn't weigh so much. Q. He didn't weigh so much at the time of his death as he did at the time the picture was taken? A. No, sir.

On cross-examination the witness testified

Mr. Scragg: " Q. What you mean to say to Mr. Jones is that these picture are not a good likeness of him, that he was thinner at the time of the shooting than in the picture? A. Yes, sir. Q. And that these are not good photographs of him on that account; they are not correct photographs? A. They are correct. Q. They don't show him as he was at the time of the shooting. A. No, sir."

### REDIRECT EXAMINATION.

Mr. Jones : " Q. Does that represent you in those photographs and tintype? A. Yes, sir. Q. Who were they taken by? A. One was taken by Mr. Frey and I don't know who the others were."

The commonwealth offered the photographs in evidence.

Mr. Scragg: We object to the offer.

The Court: I admit exhibit "No. 1" in evidence, and exclude the other two; exception noted for defendant at whose request a bill is sealed. [5]

The court charged in part as follows:

There are some undisputed facts, facts that are admitted by the defense. That Peter Meyers was killed on the afternoon of July 31, 1898, in this county, is beyond question; that fact is not in dispute; that he was slain by the defendant is also admitted. The defendant's revolver is here, the weapon with

which the killing was done; it is identified not only by witnesses for the commonwealth, but by the defendant himself, and the leaden messengers of death that caused the death of Peter Meyers are also produced here in evidence. The cause of death is not disputed, cannot be, very well, under the evidence. The coroner mentioned at least two of these wounds that were necessarily fatal. Those are undisputed facts in the case, and the question is what conclusion will the jury come to as to this homicide. Was the defendant justified that day in killing Peter Meyers? If he was, then he is not guilty of any crime. Was the deed committed in the heat of blood and passion and under great provocation? If it was then he would be guilty of manslaughter. Or will you come to the conclusion that he is guilty of murder of the second degree, or will you say by your verdict that he is guilty of murder of the first degree? In considering the evidence you will naturally begin with the evidence which throws a light on the previous relations of these two men, Joseph Keller and Peter Meyers. There is evidence on both sides as to threats made by the defendant against Peter Meyers and threats made by Peter Meyers against the defendant. It is for you to decide whether the evidence is true on these points. You have heard the testimony of the witnesses. But, in considering the evidence, as I have said, you will begin with the evidence that throws a light upon the relation of the two men, one to the other; and these threats on one side and on the other, if you believe that they were made, will show you the condition of mind of these two men when they came near or when they approached each other, at least it will have a tendency to do that.

Now what were the circumstances immediately preceding this homicide? There was a dispute about the shooting of pigeons; the two men met in regard to that question; they met I think at Keller's house, and you heard the testimony of Miss Bender on that question when she said that during the quarrel or discussion, whatever you might call it, the defendant pointed a rifle through the window from upstairs, and told them to go away or else he would drop both of them. Then you have some declarations which were testified to by some of the witnesses as occurring after the homicide. I call your attention to these because they ought to be taken in connection with any

previous threats. You remember the testimony of Miss Bender. She says that when coming from the railroad or coming up the railroad the defendant told her that Meyers, using a profane term which I will not repeat to you now, but referring to Meyers, ought to have dropped long ago. And I think it is Mr. Schuller also that testifies to a remark made by this defendant after the shooting when he told him "Don't touch that corpse or you will get the same dose as he got." Now there may be some other testimony to this effect. There you have the testimony of the commonwealth as to the threats made by the defendant against Meyers previous to the shooting, and you have the testimony that I have already referred to as to the declarations of the defendant after the shooting. They belong to the same class of evidence, because they tend to show the condition of the defendant's mind so far as it relates to the homicide. It may throw some light upon his intention, and it may raise his defense in question in the minds of the jury. But there are other threats in the case. There is considerable testimony here that Meyers made many threats against the defendant. You have the testimony of Byron Davis, his father-in-law, stating that he would kill Keller, using a vile term, and that he would "do him." And also the evidence of Mrs. Bird at the time that he showed the iron or steel knuckles, saying that he had something to fix somebody, and that he would be able to kill a man by hitting him in the right place. And further, when he went down the alley, after the discussion about the pigeons was over, she told him he better not go, and then he said, "I will head off Keller," but did not call him by that name, used a vile term, "and if he touches me I will kill him or he will kill me." Then you have the testimony of the officer, Charles Lown, who said he heard Meyers make the threat he ould get even with him before night. Then the testimony of Lizzie Slack and Minnie Keiser. Lizzie Slack testifies in substance the same as Mrs. Bird. Mrs. Keiser says Meyers made declarations that he would kill Keller or Keller would kill him before the sun set. There may be testimony of other witnesses of this nature.

Now the purpose of the evidence as to threats on the one side and the other is twofold. [The threats made by Keller against Meyers are depended upon by the commonwealth for the pur-

pose of showing Keller's attitude towards Meyers; that he had malice in his heart; that he had anger in his mind towards him; that he made these threats, and that what happened afterwards upon the railroad was in pursuance of these threats and in consummation of an intention on his part to kill Meyers. On the other hand, the threats made by Meyers against Keller are relied upon by the defense to show the condition of Keller's mind when he met Meyers upon the railroad, and to show what he had reason to expect from Meyers on account of Meyers's attitude towards him on account of his threats to do him violence, and to injure him during the day. Of course, you must understand that a threat made by one man against another, unless it is communicated to him, cannot have any effect upon the mind of the man that is threatened. There is a threat or two here, the threat testified to by Mrs. Bird and by Lizzie Slack and by Mrs. Keiser, those threats, there is no evidence that I can find in the case where they were communicated to the defendant, Keller, and it is only such threats that he knows of that can possibly have any influence or any effect upon his mind, because if a man does not know of a threat of course it has no influence upon him; but the other threats which he heard himself are to be considered by the jury in connection with his defense.] [2, 3]

Now, gentlemen, what happened on the railroad track after these men separated? You have heard the testimony that Keller, with this belt and revolver, went down the railroad, and according to his own testimony was going to his father's house, and that Meyers went down the alley, and that finally they met within sight of each other. The witnesses on this point are numerous. It is not necessary that I should go over the testimony of each witness as to what transpired from the time the two men were in sight of each other on the railroad track. We first find the defendant, Keller, talking to a man by the name of Frank Skinner, and according to all the testimony in the case we find Peter Meyers standing a certain distance off upon the railroad track. Many of the witnesses tell the story somewhat alike, they do not differ very materially, but there is some difference in the testimony of some of the witnesses for the commonwealth with the other witnesses for the commonwealth, and also in the testimony of the witnesses for the defense. These witnesses evidently were looking at the same fact, the same

events, from different standpoints, from different places; they
did not all see alike; they did not all of them see all that hap-
pened; some saw one part, some saw another part, but I think
the testimony is fresh enough in your minds and in your recol-
lections to spare me the trouble of going over the testimony of
each witness.　A number of witnesses testify that there was no
violence apparent to their view between these two men.　Ac-
cording to the testimony of some of the witnesses Keller walked
to where Peter Meyers stood, and then they walked together, one
a little in the lead of the other.　Keller pushed Meyers off; you
saw the motions of the witnesses when they testified to that fact.
Then they still walked together or separated somewhat apart
up the track or along the track, and then they both stopped.
Now what happened after they stopped on the switch and before
the shooting?　There is no evidence of a blow on either side,
that is that Meyers struck Keller or that Keller struck Meyers.
But there is evidence that Meyers pushed Keller and struck at
him, made an attempt to strike him.　You have some of the
witnesses testifying that immediately before the first shot was
fired that Meyers had his hand up and was coming towards Kel-
ler, and that Keller shot there and then.　Some of the witnesses
testify that Meyers immediately after the first shot staggered
backwards and then came forward again, and then the three
shots were fired in rapid succession, and according to some of
the witnesses he retreated backwards until he fell over the em-
bankment.　Other witnesses say that he continued to come for-
ward all the time to the same side of the embankment that Kel-
ler was on, and that he finally fell sideways and rolled down to
where the corpse was found.　So you see the witnesses use dif-
ferent expressions.　They say that Meyers "struck at Keller;"
that Meyers "pushed Keller;" that Keller "motioned and
pushed Meyers away from him;" that Meyers was trying to
"get at Keller."　Those are the expressions, the words that are
used by the witnesses; they are words of common idioms, of
common character, colloquial in their nature, and are to be taken
by the jury according to their common meaning, according to
their common acceptation by the people.　It is important that
you should come to the conclusion, as far as possible, as to the
exact facts on this part of the case—what happened there?　In
considering the evidence of these several witnesses as to what

transpired either before or after the shooting, or immediately before the shooting and at the time of the shooting, you will find, as I have said, some contradictions along the line of the testimony. The testimony of one witness is denied by another, and you have the same witnesses telling the story in a different way. Some of the contradictions are minor; that is, they are not important; others again are important, and refer to material facts. Now it is the duty of a jury always, when there are contradictions in the testimony of a number of witnesses who testify to the same facts, to harmonize the contradictions as far as possible, to consider that all witnesses do not see the same thing in the same light nor from the same point, and to try and arrive at a consecutive story made up by the jury from the testimony of all the witnesses so far as they have been able to harmonize it. That a jury can often do. Of course, when they come to a point where they cannot harmonize the testimony, where the contradiction is too flat, too apparent, then they must believe either one or the other.

Verdict of guilty of manslaughter, with a recommendation to the mercy of the court.

The court sentenced the defendant to pay a fine of $1.00 and to undergo an imprisonment in the eastern penitentiary for the term of five years and six months. The defendant appealed.

*Errors assigned* among others were (1) that the court failed to instruct the jury as to the effect, weight and relevancy of the evidence of the uncommunicated threats; (2, 3) portions of the charge as above, quoting them; (4) refusal to direct that Lown should be called as a witness; (5) the admission of the photographs of the deceased.

*John F. Scragg*, with him *John M. Harris*, for appellant.—— Uncommunicated threats are admissible to show who began the affray. They are evidence to corroborate evidence of communicated threats: 3 Rice on Evidence, p. 580; Kerr on Homicide, sec. 400; Wharton's Criminal Evidence, sec. 757; Hart v. Com., 85 Ky. 77. They are evidence to show the attitude of the deceased toward the defendant: Wiggins v. Utah, 93 U. S. 467; Stokes v. The People, 53 N. Y. 174; 3 Rice on Criminal Evidence, sec. 370.

Evidence of former threats by deceased against accused is admissible, even though not communicated to the defendant prior to the killing, where there is a doubt as to who was the aggressor, and some evidence has been given that the act was done in self-defense: Malone's Criminal Brief, p. 120; Kerr on Homicide, secs. 396–409; Meyers v. Com., 83 Pa. 131.

It is a duty in crimes of a high degree for the prosecution to call all eye-witnesses of the transaction. The prosecution is not at liberty to put in part of the evidence to make out its case and then rest; it is bound under all circumstances to call all the witnesses present at the commission of the act which is the subject of indictment: 1 Roscoe's Criminal Evidence, p. 210; 3 Russell on Crimes (9th ed.), 527; Donaldson v. Com., 95 Pa. 21; Rice v. Com., 102 Pa. 408.

Photographs are competent evidence, and when properly taken are judicially recognized as of a high order of accuracy. See Udderzook v. Com., 76 Pa. 340. But in careless, inexpert or interested hands they are capable of very serious misrepresentations of the original. Before they are permitted to be used in the trial, therefore, there should always be preliminary proof of care and accuracy in the taking of them, and of their relevancy to the issue before the jury.

*John R. Jones,* district attorney, for appellee.—The general rule seems to be that where the proof leaves a doubt concerning the defendant's motive in committing the homicide, whether he was actuated by malice or believed that he was in danger from deceased, he may prove threats of violence made toward him by deceased, provided they were communicated to him before the killing, as tending to show cause for belief that he was in great danger of receiving harm from deceased when he committed the homicide: Nevling v. Com., 98 Pa. 322; Noles v. State, 26 Ala. 31; Pritchett v. State, 22 Ala. 39; People v. Lombard, 17 Cal. 316; People v. Williams, 17 Cal. 142; Williams v. People, 54 Ill. 422; State v. Elliott, 45 Iowa, 486; Holloway v. Com., 11 Bush (Ky.), 344; Carico v. Com., 7 Bush (Ky.), 124; Hawthorne v. State, 61 Miss. 749; Johnson v. State, 54 Miss. 430; State v. Harris, 59 Mo. 550; State v. Keene, 50 Mo. 357; State v. Dodson, 4 Oregon, 64; Wood v. State, 92 Ind. 269; Dickson v. State, 39 Ohio St. 73; Lewis v. Com., 78 Va. 732; Kerr

on Homicide, p. 431, sec. 402; Davidson v. People, 4 Colo. 145; State v. Turpin, 77 N. C. 473; People v. Alivtre, 55 Cal. 263; State v. Evans, 33 W. Va. 417; Keener v. State, 18 Ga. 194; White v. Territory, 3 Wash. Ter. 397; Hart v. Com., 85 Ky. 77; Payne v. State, 60 Ala. 80; People v. Taing, 53 Cal. 602; Bond v. State, 21 Fla. 738; People v. Garbutt, 17 Mich. 9; State v. Downs, 91 Mo. 19; State v. Clum, 90 Mo. 482; Gonzales v. State, 31 Tex. 495; State v. Birdwell, 36 La. Ann. 859; Thomas v. State, 11 Tex. App. 315; Pulliam v. State, 88 Ala. 1; Griffin v. State, 90 Ala. 596; Babock v. People, 13 Colo. 515; Com. v. Holmes, 157 Mass. 233; People v. Gosch, 82 Mich. 22; State v. Harrod, 102 Mo. 590; Frizzell v. State, 30 Tex. App. 42; State v. Bradley, 64 Vt. 466; Painter v. People (Ill. 1893), 35 N. E. Rep. 64.

The English rule of practice that all the eye-witnesses to a homicide should be called to testify by the prosecution was enforced only when there were but few such witnesses : Regina v. Stroner, 1 C. & K. 650; Regina v. Holden, 8 C. & P. 547; Wellar v. People, 30 Mich. 20; Kent v. People, 8 Colo. 563; Rice on Crim. Ev. p. 124; Hurd v. People, 25 Mich. 406; Kerr on Homicide, sec. 386, p. 417; McConnell v. State, 22 Tex. App. 354.

The fact that the name of a witness is indorsed on the indictment does not of itself involve any necessary obligation to do any more than to have the witness in court ready to be examined : Rex v. Simonds, 1 Carrington & Payne, 84; Rex v. Beezley, 4 Carrington & Payne, 220; Rex v. Bodle, 6 Carrington & Payne, 186; Rex v. Harris, 7 Carrington & Payne, 581; Reg. v. Bull, 9 Carrington & Payne, 22; Reg. v. Vincent, 9 Carrington & Payne, 91; Donaldson v. Com., 95 Pa. 21.

The photograph was properly admitted : Udderzook v. Com., 76 Pa. 340; Com. v. Connors, 156 Pa. 147; Beardslee v. Columbia Twp., 188 Pa. 502; Cowley v. People, 83 N. Y. 464; Church v. Milwaukee, 31 Wis. 512; Blair v. Pelham, 118 Mass. 421; Cozzens v. Higgins, 33 How. Pr. (N. Y.) 439; Locke v. Sioux City, etc., R. R., 46 Iowa, 112; Dyson v. N. Y. & N. E. R. Co., 57 Conn. 9; Shaw v. State, 83 Ga. 92; Randall v. Chase, 133 Mass. 210; In re Stephens, L. R. 9 C. P. 187; Leathers v. Salvor Wrecking Co., 2 Woods (U. S.), 682; Daly v. Maguire, 6 Blatchf. (U. S.) 137; Luco v. U. S., 23 How. (U. S.) 515;

3 Rice on Crim. Ev. p. 153; Ruloff v. People, 45 N. Y. 213; Abbott's Trial Brief (Crim. Causes), sec. 596 ; Malachi v. State, 8 So. Rep. 104; Luke v. Calhoun Co., 52 Ala. 115.

OPINION BY Mr. JUSTICE FELL, April 24, 1899:

The defendant, in support of the allegation that he had acted in self-defense, was allowed at the trial without objection to offer proof of threats made by the deceased. Some of these threats had been made in the presence of the defendant, and heard by him ; others had been made in his absence and had not been communicated to him. In three of the assignments it is alleged as error that the court failed to call the attention of the jury to the effect that should be given to uncommunicated threats, and that in this respect the charge was inadequate and misleading. In connection with these assignments only that part of the charge is given which refers to the effect on the defendant's mind of threats made by the deceased. Earlier in the charge the attention of the jury had been called to the threats which the deceased and the accused had made against each other, and it was then clearly stated that the purpose of this testimony was to throw light on the relation in which they stood to each other and the condition of their minds when they met. It was said : "But in considering the evidence, you will begin with that which throws light upon the relation of the two men one to the other; and these threats on one side or the other, if you believe they were made, will show you the condition of mind of these two men when they came near or when they approached each other—at least it will have a tendency to do that." It was for the purpose thus stated that the testimony as to threats made by either was admissible. Proof of uncommunicated threats made by the deceased was received as tending to show his motive and intention, and thus giving rise to an inference that in the fatal encounter he was the aggressor. The effect to be given to such testimony might have been more fully explained, but what was said in the charge in relation to it was not misleading, and in the absence of a request for more specific instructions on the subject it cannot be said that the charge was inadequate.

The photograph of the deceased was offered by the commonwealth to rebut testimony that the defendant was a smaller man

than the deceased. This is a kind of testimony which should be received with caution. In a recent case, Beardslee v. Columbia Township, 188 Pa. 502, it was said by our Brother MITCHELL: "Photographs are competent evidence, and when properly taken are judicially recognized as of a high order of accuracy. See Udderzook v. Com., 76 Pa. 340. But in careless, or inexpert, or interested hands they are capable of very serious misrepresentations of the original. Before they are permitted to be used in the trial, therefore, there should always be preliminary proof of care and accuracy in the taking of them, and of their relevancy to the issue before the jury." On a question of size a photograph would probably be less reliable than on one of identity. But where other objects, whose size is known, are shown in the picture, and appear therein to have been at the same distance from the camera as the object whose size is sought to be established, a reasonably safe means of comparison is furnished. This was a full length photograph, and the witness who identified it and testified to its accuracy was represented in it, standing by the side of the deceased. This gave the jury a sufficiently safe guide.

The only remaining assignment which need be noticed relates to the refusal of the court to direct the district attorney to call a witness, Charles Lown, whose name was on the bill of indictment. To the request of the defendant's counsel, the district attorney replied that he had called all the eye-witnesses to the occurrence, and the court sustained this refusal to call the witness, on the ground that his testimony would be cumulative merely. It appears that this witness saw the shooting, and that the fact that he was present had been disclosed by witnesses before examined. The offer should however be judged in the light in which it was presented to the court at the time. The statement of the district attorney that he had called all the eye-witnesses was not controverted, and the fact that other witnesses had testified to the presence of this one was not called to the attention of the court. It then appeared to the court that the witness could have testified only to the threats which had been made some hours before the encounter, as to which there was no dispute.

The refusal to require the commonwealth to call this witness would not be ground for reversal even if it had appeared that he was present when the deceased was shot. Sixteen eye-

witnesses had already been examined.   While it is the duty of the district attorney in such a case as this to present all the testimony on the material facts, whether adverse to the defendant or favorable to him, the court in its discretion may limit the number of witnesses to be called.   There was not a withholding of testimony favorable to the defendant or a failure on the part of the district attorney to present to the jury all the material facts.   It was the right of the defendant to have all of the facts connected with the shooting fully and fairly disclosed by the prosecution, but it was not his right to have them repeated over and over indefinitely by all the persons who saw the occurrence.

The case seems to have been tried with great care and ability by the learned judge, and the record discloses no error calling for a reversal.

The judgment is affirmed.