## Commonwealth *v.* Gockley, Appellant.

438

Argued April 17, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Martin W. Binder,* with him *James R. Hevalow,* for appellant.

*Peter F. Cianci,* Assistant District Attorney, with him *Frederick O. Brubaker,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. CHIEF JUSTICE BELL, July 2, 1963:

Appellant was tried for the murder of Clement J. Smith and was convicted by a jury of murder in the second degree. Following the dismissal by the trial Court of appellant's motions for a new trial and for an arrest of judgment, a sentence of not less than 10 years and not more than 20 years of imprisonment was imposed. From that judgment the appellant now appeals.

The law is well established that in considering the appeal of a defendant after a verdict or plea of guilty, the test of the sufficiency of the evidence is whether accepting as true all the evidence upon which, if believed, the jury could have properly based its verdict, such evidence is sufficient in law to prove beyond a

reasonable doubt that the defendant is guilty of the crime charged: *Commonwealth v. Gooslin,* 410 Pa. 285, 286-287, 189 A. 2d 157; *Commonwealth v. Burns,* 409 Pa. 619, 633, 187 A. 2d 552; *Commonwealth v. Kravitz,* 400 Pa. 198, 208, 161 A. 2d 861; *Commonwealth v. Johnson,* 410 Pa. 605, 190 A. 2d 146; *Commonwealth v. Dickerson,* 406 Pa. 102, 176 A. 2d 421; *Commonwealth v. DeMoss,* 401 Pa. 395, 165 A. 2d 14; *Commonwealth v. Moore,* 398 Pa. 198, 157 A. 2d 65.

The evidence produced by or in favor of the Commonwealth may be thus summarized:

During the month of March, 1960, Mabel Klein and Clement J. Smith two residents of the City of Reading, disappeared from their respective homes. Police officers who were investigating these disappearances ultimately learned that appellant had had some business relations with Mrs. Klein. Appellant was a general contractor and painter. He had discussed with her some alterations she wished to have made in her house. On July 15th, September 13th, and October 20th, 1960, the officers spoke to appellant about Mrs. Klein's disappearance. On the first two of these occasions appellant had stated that he knew nothing about the whereabouts of Mrs. Klein. However, during his interview with the police on October 20th, he said: "I don't know why you are bothering me all the time. Why don't you check with Clement Smith?"

On October 22, 1960, the police officers interrogated Myrtle Messner, Smith's landlady, who rented rooms by the week. When asked what had become of Smith, Mrs. Messner stated that late in February or early in March of 1960, Smith "just went off" and she had never seen him again. When asked what happened to Smith's effects, Mrs. Messner testified that in March of 1960 the appellant had appeared at her rooming house having in his possession keys both to her front door and to Smith's room. She had never given these

keys to appellant. He told her that he was "supposed to take Mr. Smith's belongings out and also his mail." Mrs. Messner requested appellant to obtain proper authorization from Smith.

A few days later Mrs. Messner received by mail, in an envelope postmarked Baltimore, Maryland, March 21, 1960, a card purportedly signed by Smith authorizing Mrs. Messner to permit appellant to remove Smith's effects. A few days later, on March 26, 1960, appellant returned to Mrs. Messner's premises, paid her $4.50 for a week's rent on Smith's behalf, plus $18.50 for other items, for all of which she gave him a receipt. Mrs. Messner thereupon permitted appellant to remove Smith's mail and furniture, for which he gave her a receipt.

The Reading police sent to the FBI for comparison an authenticated specimen of Smith's signature and the above mentioned card which was purportedly signed by Smith. The FBI expert testified that in his opinion Smith had not signed the card.

On November 17, 1960, having become convinced that (defendant) appellant was connected in some way with the disappearance of Smith, the police secured a warrant for his arrest and took him to the detective bureau at City Hall, Reading. Captain Feltman, Chief of the Reading Police, then informed appellant that he (Feltman) would have to obtain a search warrant to examine appellant's premises, known as the Englewood Tennis Club, which was both his home and place of business. Appellant replied that a search warrant would not be necessary and that Captain Feltman might search the premises as much as he wished, so long as he put everything back where he had found it. Appellant then delivered to Captain Feltman the keys to his premises.

Appellant was repeatedly interrogated by the police on November 17th and 18th, 1960. At first appellant

said that he had not seen Smith since March 11, 1960, when he happened to meet him on the street in Reading. He also asserted that Smith had given him authority to remove his furniture and mail from Mrs. Messner's establishment.

On November 19, 1960, the police searched appellant's premises in his absence. They found considerable mail addressed to Smith. Being convinced that appellant was not telling them the truth, the officers immediately (viz., on November 19th) obtained additional warrants for appellant's arrest and took him to State Police Barracks for further interrogation. In the course of such interrogation, which was taken down stenographically, appellant admitted knowledge of the deaths of both Mrs. Klein and Smith. At this interrogation he stated that on an unspecified date in March of 1960 Smith had appeared at appellant's premises in an automobile which contained the dead body of Mrs. Klein. According to appellant, Smith stated that he had stolen the automobile in Baltimore. Appellant said he had had an argument with Smith arising out of appellant's objections to Smith's bringing Mrs. Klein's body to appellant's home. In the course of this argument Smith menaced appellant with the latter's single barreled 12-gauge shotgun and while the two men were struggling for possession of this weapon, it was accidentally discharged, wounding but not killing Smith. Defendant then said that he had killed Smith with another shell "to put him out of his misery." Appellant further admitted that he had subsequently *buried both bodies on his premises*. He also admitted that he had written the above-mentioned card which was sent to Mrs. Messner, and added that he also had sent letters to friends and acquaintances of Mrs. Klein which were intended to allay their concern about her disappearance.

While the record of appellant's interrogation was being transcribed, the police took the appellant to the Englewood Tennis Club (his home and place of business) where he willingly pointed out to them where they should dig for the two bodies. The bodies of Smith and Mrs. Klein were found in a common grave in an advanced state of decomposition and putrefaction. That one body was that of a woman was established by hair which was still connected to the skull; that the other body was that of Smith was established by his dentist and by clothing which was recognized by a member of Smith's family. When Smith's body was examined by a pathologist, he found in the body wadding from a shotgun charge. The presence of shotgun pellets in Smith's body was shown and proved by X-rays.

The police investigated appellant's story concerning the car allegedly stolen in Baltimore by Smith, and learned that no car of that make and model had been reported as stolen in Baltimore at or about the time in question. On December 9, 1960, the police therefore again interrogated appellant concerning the circumstances of the deaths of Mrs. Klein and Smith. Appellant then gave a different account of the death of Mrs. Klein. In this second statement he abandoned his original story that Smith had brought Mrs. Klein's dead body to the Tennis Club. Instead, the story he now told was that he himself had taken her to the Tennis Club in his automobile on a particular Sunday in order that they might more conveniently discuss the carpentry work he was planning to do for her. Later that evening Smith unexpectedly dropped in to pay a visit. According to appellant, Smith and Mrs. Klein commenced a romantic affair which continued until late the following Thursday or Friday. He found them occupying the same bed Sunday night and Monday morning. Between Sunday night and late Thursday or

Friday, appellant was away from his home during working hours. However, while he was at home, in the mornings and evenings, he found them still in his house; some of the time they were drinking together, and some of the time they were sleeping together. Far more important, he stated that on his return to his home late on Thursday or Friday, Smith took him to a bedroom and showed him Mrs. Klein's dead body. Appellant said Smith told him Mrs. Klein had died of natural causes. Appellant in this, *his second statement,* gave the same account as before concerning his subsequent argument with Smith, in the course of which Smith had threatened appellant with the latter's single barreled 12-gauge shotgun and while he and Smith were struggling for possession of the gun, it was accidentally discharged, killing Smith. However, in this second statement appellant denied that he deliberately fired a second shot and thus killed Smith. He again admitted burying the two bodies. At the trial appellant's testimony was the same as his above-mentioned second statement.

Appellant has assigned numerous trial errors, each of which, he contends, deprived him of his Constitutional rights or violated the decisional law and entitle him to a new trial. We shall discuss them seriatim.

(1) Did the Court err in permitting the Commonwealth to use evidence obtained through an allegedly unreasonable search and seizure?

There was no unreasonable search and seizure. Following appellant's consent to a search of his premises and his delivery to Captain Feltman of the keys to such premises, appellant turned over to Captain Feltman a 12-gauge single barrel shotgun, while the police and the appellant were at the Tennis Club. The police also found a box of "pumpkin ball" shells and another

box of Winchester shells. Moreover, the shotgun and the shells were admitted in evidence *without objection* on the part of appellant's competent counsel. Although the two papers appellant had turned over to Captain Feltman on October 31st were not admitted in evidence and played no part in the trial,* appellant nevertheless contends that these papers as well as the gun and shells were used against him and constituted evidence obtained through unreasonable search and seizure.

The Constitutionally ordained right of the people "to be secured in their persons, houses, papers, and effects against unreasonable searches and seizures" may be waived, and searches and seizures conducted *with the consent* of the defendant in a criminal case do not come within the prohibition of the IVth Amendment to the Constitution of the United States: *Commonwealth v. O'Malley*, 81 Pa. Superior Ct. 100; *Anderson v. United States*, 255 F. 2d 96 (C.C.A. 5), cert. denied 358 U.S. 845; *Shores v. U.S.*, 174 F. 2d 838 (C.C.A. 8); *Ruhl v. U. S.* 148 F. 2d 173, 174, (C.C.A. 10); *Grice v. U.S.*, 146 F. 2d 849 (C.C.A. 4); *Howard v. U.S.*, 75 F. 2d 562 (C.C.A. 7), cert. denied 295 U.S. 740; *Schutte v. U.S.*, 21 F. 2d 830 (C.C.A. 6); *U.S. v. Haas*, 106 F. Supp. 295, 109 F. Supp. 443; 79 C.J.S., pages 816-818; 47 Am. Jur., page 547. The Commonwealth's evidence was amply sufficient to show consent.

Furthermore, it is not a violation of the Constitutional guarantee against unreasonable search and seizure for officers when making a *lawful* arrest with or without a search warrant, to discover and seize any

---

* On October 31, 1960, the police officers interviewed appellant at the Tennis Club. They asked for and received from him two documents, (apparently) relating to his dealings with Mrs. Klein. When appellant was cross-examined concerning these papers at the trial, the papers themselves and evidence concerning them were excluded by the Court on defendant's complaint that interrogation on the subject might incriminate him on the separate crime of forgery.

evidence, articles or fruits of crime found upon the prisoner or upon the premises under his control at the time of his lawful arrest, if it is directly connected with the offense charged. This constitutes merely an incidental seizure of evidence of crime in the execution of a lawful arrest and not a wrongful invasion of the home by an unwarranted seizure of property. The maintenance of public order and the protection of society by efficient prosecution of criminals require it: *Ker v. California,* 31 L.W. 4611, June 10, 1963; *Weeks v. U.S.,* 232 U.S. 383, 392; *Adams v. New York,* 192 U.S. 585; *Boyd v. U.S.,* 116 U.S. 616; *Commonwealth v. Stubler,* 84 Pa. Superior Ct. 32, 34, 35; *Commonwealth v. Grasse,* 80 Pa. Superior Ct. 480, 484, 485; *Commonwealth v. Finch,* 80 Pa. Superior Ct., 386, 388.

In *Ker v. California,* supra, the Court held that evidence is admissible which is the product of a search incident to a *lawful arrest even where the officers had no search warrant* and broke into a man's home having reasonable cause to believe that an offense has been or is being committed, provided the peace officers demand admittance and explain the purpose for which the admittance is desired. The Court said (pages 4616, 4617): ". . . The doctrine that a search without warrant may be lawfully conducted if incident to a lawful arrest has long been recognized as consistent with the Fourth Amendment's protection against unreasonable searches and seizures. See Marron v. United States, 275 U.S. 192 (1927); Harris v. United States, 331 U.S. 145 (1947); Abel v. United States, 362 U.S. 217 (1960); Kaplan, Search and Seizure: A No-Man's Land in the criminal Law, 49 Cal. L. Rev. 474, 490-493 (1961). The cases have imposed no requirement that the arrest be under authority of an arrest warrant, but only that it be lawful. See Marron v. United States, supra, at 198-199; United States v. Rabinowitz, supra, at 61; cf. Agnello v. United States, 269 U.S. 20, 30-31

(1925). . . . The search of the petitioners' apartment was well within the limits upheld in Harris v. United States, supra, which also concerned a private apartment dwelling. The evidence here, unlike that in Harris, was the instrumentality of the very crime for which petitioners were arrested [a brick of marijuana], . . ."

### (2) Pre-trial inspection by defendant.

A hearing was held in open Court on March 7, 1961, which was attended by appellant and his counsel. Counsel for (defendant) appellant then presented a petition for a rule on the District Attorney to require the latter to permit appellant to examine certain documentary and other tangible evidence in the possession of the District Attorney or of the State Police. At this hearing the District Attorney agreed to make available to counsel for defendant certain of the material requested and to authorize other individuals in possession of desired material to make it available to counsel. As to additional matters* the Court denied the appellant access unless he could produce authorities which would require the Court to act favorably on appellant's application in those particular matters.

The record shows that appellant's attorneys apparently agreed to the offers made by the District Attorney and to the rulings of the Court. During the next six months prior to appellant's trial (which commenced on September 18, 1961) appellant's counsel never asked for an additional or final order or ruling on the applications which they had made at the hearing on March 7, 1961. The record shows that counsel for the appellant had access to and an opportunity for examining both of appellant's above-mentioned statements.

---

\* Neither appellant's nor appellee's brief discloses what these additional matters were.

Appellant's counsel made no objection to the introduction into evidence of portions of these statements and in fact agreed to such admission. We believe that the lower Court gave defendant more than he was entitled to under the law. Many defendants and their attorneys and some Courts forget that Justice is not a one-way street, and that *in the interest of Justice every Court has a duty to protect the law-abiding community, as well as the basic rights of an accused to a fair trial.* Furthermore it is still the law of Pennsylvania that a defendant is not entitled to any such pre-trial discovery *as a matter of right.* Questions involving pre-trial discovery in criminal cases lie generally within the discretion of the trial Judge and his action will not be reversed unless such discretion was abused: *Commonwealth v. Wable,* 382 Pa. 80, 86, 114 A. 2d 334; *Commonwealth v. Evans,* 190 Pa. Superior Ct. 179, 230, 154 A. 2d 57. This general rule was not abrogated or changed by *Petition of DiJoseph,* 394 Pa. 19, 145 A. 2d 187, where the facts and circumstances were exceptional and extraordinary. There was no abuse of discretion to the prejudice of the appellant in this case.

(3) What witnesses can and must be called by the District Attorney?

Appellant contends that the Commonwealth is limited to calling as witnesses at the trial of the cause, only those persons whose names are endorsed on the bill of indictment. This contention of the appellant is devoid of merit. From the time of Blackstone, under the common law as well as under the pertinent penal statutes of Pennsylvania and the decisions interpreting them, the Commonwealth is not limited in its production of evidence to those witnesses whose names are listed on the bill of indictment: *Commonwealth v. Emmel,* 194 Pa. Superior Ct. 441, 168 A. 2d 609; 14 Am. Jur. §208. Furthermore it is not necessary for

the Commonwealth *under all circumstances* to call at the trial *all* such witnesses: *Commonwealth v. Horn,* 395 Pa. 585, 589, 150 A. 2d 872, and cases cited therein; *Commonwealth v. Palermo,* 368 Pa. 28, 81 A. 2d 540; *Commonwealth v. Deitrick,* 221 Pa. 7, 70 A. 275; *Commonwealth v. Giacobbe,* 341 Pa. 187, 19 A. 2d 71; *Commonwealth v. Zec,* 262 Pa. 251, 105 A. 279; *Commonwealth v. Keller,* 191 Pa. 122, 43 A. 198; Act of March 31, 1860, Sections 27 and 35, P.L. 427, 19 P.S. §§262, 782. In the *Emmel* case, supra, the Superior Court held that the right of a defendant to know who his "accusers" are, requires only that the names of those who testify before the Grand Jury be endorsed on the indictment: *Commonwealth v. Brownmiller,* 137 Pa. Superior Ct. 261, 9 A. 2d 155, which is the sole authority relied upon by appellant, does not support his contention.

(4) Admissibility of evidence concerning Mrs. Klein's death.

The only evidence of another crime which was admitted in evidence was that pertaining to the death or killing of Mrs. Klein* and the relationship between her and Smith and the appellant. Even if the evidence as to the death of Mrs. Klein and the relationship between her and Smith and her connection with the defendant had not been part of defendant's confession, such evidence was an inseparable, indispensable and inextricable part and parcel of this case, and because of this fact could not possibly have been separated or eliminated: *Brown v. Commonwealth,* 76 Pa. 319, 337; *Commonwealth v. Wable,* 382 Pa. 80, 84, 114 A. 2d 334. *Commonwealth v. Wable* is on its facts similar to the

---

* In arguing this point, appellant seems completely oblivious of the fact that upon his objection the trial judge specifically ruled out evidence which might have connected the appellant with the independent crime of forgery.

instant case and aptly states the controlling principle of law. The Court said (p. 84) : "It is true, of course, that a distinct crime, except under certain special circumstances, cannot be given in evidence against a defendant who is being tried for another crime, because the fact of the commission of one offense is not proof of the commission of another. . . . But it is also true that sometimes there exist the 'special circumstances' which operate as exceptions to the general rule, and bring the case within the equally well established principle that evidence of other crimes is admissible . . . where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other. A veritable multitude of authorities in our appellate courts enunciate, albeit in varying language, this familiar principle [citing cases]." *Johnston v. United States,* 22 F. 2d 1, 5 (C.C.A. 9) ; *United States v. Cohen,* 73 F. Supp. 96, 99 (D.C.W.D. Pa.) ; *United States v. Wheeler,* 172 F. Supp. 278, 283 (D.C.W.D. Pa.).

There was no error in the admission of evidence concerning the death and burial of Mrs. Klein.

### (5) Dr. Desjardins' testimony.

Appellant admitted the qualifications of Dr. Desjardins as a pathologist, a specialty which includes the performing of autopsies to determine the cause of death. This witness performed an autopsy on the body of Smith. He testified that he had found in Smith's body round paper discs and wadding which, as a result of his vast experience, he recognized as parts of a shell. Based on his examination of the body he expressed his professional opinion that Smith died as the result of gunshot wounds, although in response to a query by the Court he stated that Smith's body was in such a state of decomposition he was unable to state

definitely whether or not there was some other cause of death or cooperating factor. Dr. Desjardins' opinion was corroborated by the testimony of a ballistic expert, Lieutenant Crowthers, who testified that the paper discs and wadding which Dr. Desjardins had removed from Smith's body were part of a shotgun shell of the same type as those which the police had found on appellant's premises. Moreover, appellant's contention that Desjardins' opinion as to the cause of death was inadmissible, becomes ridiculous in the light of *appellant's own testimony* that Smith died as a result of a charge of shot from a shotgun.

(6) Did the Court err in permitting Detective Krause to testify to incriminatory and prejudicial hearsay statements made by him to appellant in order to elicit from appellant the statement he made on December 9, 1960?

On December 9, 1960, Detective Krause, of the Reading Police force, one of the investigating officers, had a conversation with defendant in which Krause told him (inter alia) that the investigation he had made in Baltimore of appellant's previous statements about a car stolen by Smith showed appellant's statements to be false. Appellant contends that the introduction of this evidence and his reply was error. In order to determine whether a statement or confession was voluntary or coerced, all the circumstances and conditions existing at and prior to its making are admissible. The totality of the circumstances under which they are given must be considered: *Commonwealth v. Bryant,* 367 Pa. 135, 143, 79 A. 2d 193; Wigmore on Evidence Vol. III (3rd Ed.) §822; *Commonwealth v. Graham,* 408 Pa. 155, 162, 182 A. 2d 727; *Commonwealth v. Ballem,* 386 Pa. 20, 27, 123 A. 2d 728; *Commonwealth v. Johnson,* 372 Pa. 266, 272-274,

93 A. 2d 691; *Commonwealth v. Bolish,* 381 Pa. 500, 524, 113 A. 2d 464. Furthermore, prior false or contradictory or conflicting statements by the accused are admissible* since the jury may infer therefrom that they were made with an intent to divert suspicion or to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indicatory of guilt: *Commonwealth v. Kravitz,* 400 Pa. 198, 217, 161 A. 2d 861; *Commonwealth v. Dickerson,* 406 Pa. 102, 107, 176 A. 2d 421; *Commonwealth v. Bolish,* 381 Pa. 500, 524, 113 A. 2d 464; *Commonwealth v. Sauders,* 390 Pa. 379, 388, 134 A. 2d 890; *Commonwealth v. Homeyer,* 373 Pa. 150, 158, 94 A. 2d 743. Unless Krause could testify what he said to appellant and what appellant said to him—without a full disclosure of the entire conversation between appellant and him as to this possible crime and appellant's connection with it—it would have been impossible for the jury or the Court to decide whether appellant's second statement was voluntary, coerced, or the result of inducements offered by Krause. We are convinced that this testimony was properly admitted and there is no merit in this contention of appellant.

(7) Was defendant's confession admitted in evidence without prior proof of the corpus delicti and did the Court err in dismissing defendant's demurrer to the evidence?

Contrary to appellant's contention that the corpus delicti had not been proved prior to the admission of his confession, there was ample evidence before appellant's confessions were introduced that Smith, the alleged victim of the murder, was actually dead and that his death took place as a result of a felonious act or under circumstances which were consistent with

---

* Especially when he never denied making them.

the crime, namely, his dead body was found buried in defendant's premises and his body contained shotgun discs, wadding and pellets: *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A. 2d 861; *Commonwealth v. Frazier,* 411 Pa. 195, 191 A. 2d 369; *Commonwealth v. Homeyer,* 373 Pa. 150, 94 A. 2d 743; *Commonwealth v. Lettrich,* 346 Pa. 497, 31 A. 2d 155; *Commonwealth v. Turza,* 340 Pa. 128, 16 A. 2d 401; *Commonwealth v. Stokes,* 409 Pa. 268, 186 A. 2d 5; *Commonwealth v. Ross,* 403 Pa. 358, 169 A. 2d 780; *Commonwealth ex rel. Lagana v. Day,* 385 Pa. 338, 123 A. 2d 172.

In *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A. 2d 861, the Court, quoting from *Commonwealth v. Homeyer,* 373 Pa. 150, said (page 209) : " '. . . The Commonwealth in such a case, in order to establish the corpus delicti, must prove (1) that the alleged victim is dead, and (2) that the death occurred as a result of a felonious act. The corpus delicti, like other facts, may be shown by circumstantial evidence; it is sufficient if these circumstances are consistent with crime even though they are also consistent with suicide or accident; if it were otherwise, it would be impossible in many cases, where there were no eye witnesses, to convict a criminal: [citing cases].' " The evidence in this case overwhelmingly meets the tests set forth in the foregoing authorities.

(8) Did the District Attorney's questions constitute reversible error?

Appellant complains of the following cross-examination by the District Attorney. The District Attorney asked,—referring to appellant's testimony that he had sponged on various women for food and board— "Is it usually your fortune to run into these kind ladies?" Appellant's counsel objected and the objection was sustained. Nevertheless, in spite of his attorney's objection and the ruling of the Court, appellant

answered the question, albeit evasively. Even if this was not a proper or relevant question, the error was harmless. Furthermore, no request was made to have the answer stricken or to withdraw a juror. "A party may not remain silent and take chances on a verdict and afterwards complain of matters which, if erroneous, the Court would have corrected: Commonwealth v. Razmus, 210 Pa. 609." *Commonwealth v. Pava,* 268 Pa. 520, 525, 112 A. 103. Accord: *Commonwealth v. Mendola,* 294 Pa. 353, 144 A. 292; *Commonwealth v. Letherman,* 320 Pa. 261, 269, 181 A. 759.

(9) Did the fact that the District Attorney asked leading questions of the Commonwealth's witnesses constitute reversible error; and did the trial Judge take an unduly active participation in the trial of this case in a manner that was prejudicial and unfair to defendant?

We have examined, as is our duty, the entire record and find no abuse of discretion or reversible error in the entire record. The extent to which a Court tolerates leading questions, or suggests how questions asked by counsel should be phrased or rephrased so as to avoid error, and the extent to which the trial Judge himself elicits information, are matters within the discretion of the trial Judge and we will not reverse his exercise of such discretion except in cases of clear abuse. Cf. *Commonwealth v. Jordan,* 407 Pa. 575, 581, 181 A. 2d 310; *Commonwealth v. Horn,* 395 Pa. 585, 591, 150 A. 2d 872; *Commonwealth v. Watts,* 358 Pa. 92, 56 A. 2d 81; *Commonwealth v. Carluccetti,* 369 Pa. 190, 204-5, 85 A. 2d 391; *Commonwealth v. Myma,* 278 Pa. 505, 508, 123 A. 486.

With respect to leading questions, we agree with Judge HESS that counsel for both sides sinned to the same degree. Furthermore, no objections or motions to

strike were made by appellant's counsel on this score. As stated above, counsel cannot remain silent in matters such as this, take a chance on the result, and then allege reversible error.

Our reading of the entire record convinces us (a) that there was no abuse of discretion and (b) that in the trial of this case Judge Hess held the scales of Justice evenly, and vigilantly protected the rights of the appellant.

### (10), Separation of the jury.

At the session of this trial held Saturday, September 23, 1961, it was necessary to call a recess until the following Monday so that counsel for the defendant could examine one of the statements given by appellant. Realizing that some of the jurors might feel an obligation to attend Church on Sunday, the Court interrogated the jurors and found that the Roman Catholic members desired to attend Church. After giving the matter careful thought Judge Hess then announced that the Roman Catholic jurors, accompanied by a bailiff, could attend the 9 o'clock mass at St. Paul's Roman Catholic Church. Judge Hess stated that he would call Father Huesman, the pastor of that Church, in order that the Catholic jurors would sit by themselves, speak to no one, including the pastor himself, and that he (Father Huesman) should refrain from any reference to the trial. From the record it would appear that the appellant personally agreed to this arrangement. Furthermore, there is nothing in the record to show that the Catholic jurors availed themselves of the opportunity for Church attendance which the Court had sanctioned. Nevertheless appellant asked for the withdrawal of a juror and contends that (a) regardless of consent and (b) regardless of the record, there should be a new trial because the Court permitted a separation of the jury in a murder trial.

Moreover, one of the jurors without obtaining consent from the Court went, unaccompanied, for a haircut to the barber shop at the hotel where the jury were quartered. When this was reported to the Court, the offending juror and the barber were both questioned in open court. It was clear from their testimony that no one had talked to the juror in the barber shop or elsewhere about the trial in which he was serving. Appellant asked for the withdrawal of a juror and rejected the Court's offer to substitute one of the alternate jurors.

As far as attendance at Church by the Catholic jurors is concerned, the lower Court believed that if they did not talk to anyone, the "separation" of the jurors was no greater than if and when they occupied different sleeping rooms in the same hotel. Judge HESS aptly said: "We are completely satisfied that if in fact the two incidents complained of amounted to a separation of the jury the record indicates conclusively that no harm resulted to the defendant. His counsel do not attempt to set forth how their client was prejudiced in any way. Separation of the jury, even in a capital case, does not necessarily require the granting of a new trial if no harm or prejudice resulted to the defendant as a result of the separation."

It is a well established *general rule* that once a jury has been sworn in a capital case, its members may not separate until they have been discharged: *Peiffer v. Commonwealth*, 15 Pa. 468; *Commonwealth v. Fisher*, 226 Pa. 189, 75 A. 204; *Commonwealth v. Ronello*, 251 Pa. 329, 339, 96 A. 826. But we are living in a modern and practical age and there are exceptions to nearly every general rule. This Court has repeatedly held that the separation of the jury *even in a capital case* will not justify the grant of a new trial if it *clearly appears* that a juror was not improperly influenced and that the defendant was not prejudiced by what

transpired: *Commonwealth v. Manfredi,* 162 Pa. 144, 29 A. 404, (where jurors slept in two unconnected rooms at a hotel); *Moss v. Commonwealth,* 107 Pa. 267, (where a juror absented himself, in the company of a bailiff, to obtain medical attention); *Alexander v. Commonwealth,* 105 Pa. 1, (where several jurors under the charge of a bailiff attended church and listened to a sermon on the desirability of the punishment of murderers); *Commonwealth v. Gearhardt,* 205 Pa. 387, 54 A. 1029, (where jurors went to a barber shop for shaves); *Commonwealth v. Blakeley,* 274 Pa. 100, 107, 117 A. 685, (where a juror went to his home with a bailiff to obtain clothes); *Commonwealth v. Williams,* 209 Pa. 529, 58 A. 922, (where an absent-minded juror went home following an adjournment, but was quickly recalled without his having conversed with anyone); *Commonwealth v. Insano,* 268 Pa. 1, 110 A. 248, (where, without Court sanction, a juror, suffering from neuralgia, was taken to a dentist); and *Commonwealth v. Kosh,* 305 Pa. 146, 158, 157 A. 479, (where, on a viewing by the trial Judge, counsel, and the jury, of the room which was the scene of the crime, the small size of the room made it necessary for the jury to be divided and a juror spoke to an outsider who was present).

In *Kosh,* 305 Pa., supra, the Court well said (page 158): "It is not contended that the defendant was injured or prejudiced by anything the jurors did at that time, and the general rule is that *a new trial will not be granted unless the alleged misconduct was prejudicial to the accused*:* Moss v. Com., 107 Pa. 267; Com. v. Gearhardt, 205 Pa. 387; Com. v. Filer, 249 Pa. 171; Com. v. Blakeley, 274 Pa. 100. Such matters rest largely in the discretion of the trial judge: Alexander v. Com., 105 Pa. 1; Com. v. Manfredi, supra."

---

\* Italics throughout, ours.

We agree with the trial Judge that the evidence as to the temporary separations of the jury in the instant case showed that there had been no prejudice to the appellant, and we are convinced that the trial Judge did not abuse his discretion in declining to grant a new trial because of the separation of the jury either in Church or in the barber shop. However, we deem it proper to add that in a case where an accused is charged with murder the general rule should be strictly followed whenever reasonably possible, and that a jury should be kept together and free from even a suspicion of improper influence.

Appellant had a fair trial and is fortunate that the jury brought in a verdict of murder in the second degree. The Commonwealth's evidence, if believed, was amply sufficient to prove that appellant was guilty of murder in the first degree.

We have carefully considered all of the contentions of the appellant and find no abuse of discretion or reversible error of law.

Judgment affirmed.

Mr. Justice BENJAMIN R. JONES and Mr. Justice COHEN concur in the result.