## Commonwealth v. Cathcart

*Bernard P. Carey, Jr.,* Assistant District Attorney, for Commonwealth.

*Roy H. Davis,* for defendant.

BLOOM, J., November 20, 1970.—Defendant, Louis Cathcart, was convicted by a jury for rape, rape of a female under 16 years of age, assault with intent to ravish and corrupting the morals of a minor. Defendant thereafter filed a motion for a new trial and in arrest of judgment, asserting as grounds that:

1. The verdict was against the law;

2. The verdict was against the weight of the law;

3. The verdict was against the evidence;

4. The verdict was against the weight of the evidence;

5. The court erred in permitting the wife of defendant to testify against him;

6. His constitutional rights were violated in that he was not brought to trial within two terms of court.

The victim of the rape was Jennie Newlin, age four, who was born to Marian Wilson prior to her marriage.

Mrs. Wilson, the mother of the child, was the first witness called by the Commonwealth. She testified that on November 21, 1969, defendant, her brother-in-law and uncle of the child, came to the house where the Wilsons were living with her parents at 1355 Green Street, Linwood, Pa. After defendant had been there a short time, he took the child to his house which was located four doors away. Mrs. Wilson followed after defendant and her child as defendant had left his keys on the table in her home. After she returned the keys, she went back to her home. Mrs. Wilson stated that her child was often left with defendant and his wife, Patricia, defendant being married to Mrs. Wilson's sister.

About 20 minutes after the child had been left with defendant, defendant's wife, Patricia Cathcart, came to Mrs. Wilson and stated that "he hurt the baby." Mrs. Wilson immediately went to defendant's house where she found the child in the living room wearing her underclothes and one sock. Mrs. Wilson stated that the child had left with defendant fully clothed. She then noticed that her daughter had blood on her underpants near the area of the vagina. Mrs. Wilson picked up the child and took her home where she was examined by Mrs. Wilson's mother and stepfather. The child was then taken to a hospital where she was discharged at about 11 p.m. that same night. The only other significant statement Mrs. Wilson made was that defendant appeared to have been drinking when he had come to the Wilson house.

The next witness called was Julia Mutro, mother of Mrs. Wilson, who corroborated Mrs. Wilson's testimony and added that she and her husband had examined her grandchild. She stated that the child's vagina was caked with blood and was still bleeding. Thereafter, Mrs. Mutro called Mr. Wilson, the step-father of the child, and the police.

Over objection, defendant's wife, Patricia Cathcart, testified on behalf of the Commonwealth. Mrs. Cathcart stated she was in her home when her husband, defendant, came in with the child. At first, defendant and the child went into the living room but then went upstairs when Mrs. Wilson came to visit. Defendant said that he and the child were going upstairs to sleep. The next thing Mrs. Cathcart remembered was hearing a scream in the bedroom. She went upstairs and found defendant and the child lying on the bed. Mrs. Cathcart also stated that defendant was nude and when she asked defendant what had happened, they got into an argument and defendant tried to choke his wife. She then ran to the Wilson home and told Mrs. Wilson and her mother what had happened.

Further questioning revealed that the child was often at defendant's home and that on occasion, Mrs. Cathcart would babysit with the child. Mrs. Cathcart related that defendant was not seen again until November 28, 1969.

The Commonwealth then called Richard E. Surgent who, on November 21, 1969, was the physician on duty at Sacred Heart Hospital, Chester, Pa., where Doctor Surgent examined the child. He stated that he found a tear in her vagina and some adult pubic hairs in the child's vagina as well as blood clots. It was the opinion of Doctor Surgent that the child's sexual organs had been penetrated because of the internal damage done to her sexual organs.

The Commonwealth completed its case by introducing testimony concerning the apprehension of defendant in the State of Maryland.

Defendant offered no evidence in his own behalf, and no exceptions were taken to the charge of the court.

Of great importance to the Commonwealth's case was the testimony of defendant's wife. The court per-

mitted Mrs. Cathcart to testify in light of the Act of May 23, 1887, P.L. 158, sec. 2(b), as amended, 19 P.S. §683, which provides:

"Nor shall husband and wife be competent or permitted to testify against each other . . . except . . . in any criminal proceeding against either for bodily injury or violence attempted, done or threatened . . . upon the minor children of said husband and wife, *or the minor children of either of them, or any minor child in their care or custody, or in the care or custody of either of them* . . ." (Italics supplied.)

We have found no cases in Pennsylvania where the Act of May 23, 1887, P.L. 158, sec. 2(b), as amended, has been interpreted in light of the facts existing in this case. The only cases we could find that have been decided where minor children have been involved are cases involving a parental relationship between the testifying spouse and the criminally abused minor: Commonwealth v. Maroney, 414 Pa. 161 (1964), where defendant shot and killed his 18-year-old son; Commonwealth v. Nadolny, 163 Pa. Superior Ct. 517 (1949), where defendant was convicted of statutory rape of his stepdaughter; Commonwealth v. Claudy, 36 Erie 159 (1952), where defendant murdered his daughter; and Commonwealth v. Poe, 65 York 125, 80 D. & C. 157 (1951), where defendant was tried for the statutory rape of his three daughters. Upon reading the foregoing act, it is quite clear that these cases fall within the purview of this statute. The problem in the present case, however, is whether the statute encompasses the minor child of a third person who is left in the care or custody of a defendant.

The present situation did arise in one case outside the jurisdiction of Pennsylvania. In People v. Clarke, 366 Mich. 209, 114 N.W. 2d 338 (1962), the Michigan Supreme Court held that under the Michigan statute

respecting competency, a wife was not permitted to testify against her husband, who was tried for taking indecent liberties with a minor child who was not the issue of either, but who had lived with defendant and his wife since birth. However, upon examination of the Michigan statute, no quarrel can be taken with the Clarke decision, since the Michigan law was clearly limited to "cases of prosecution for a crime committed against the *children of either or both.*"

A study of the history of the Pennsylvania statute discloses that it had originally been enacted May 23, 1887, P.L. 158, sec. 2(b), and only permitted spouses to testify against each other in proceedings for desertion and maintenance and in criminal proceedings against a spouse for bodily injury or violence attempted or done upon the person of the other spouse. The original act was subsequently amended by section 1 of the Act of April 27, 1909, P.L. 179, by inserting the provisions as to minor children. The statute then attained its present form by section 1 of the Act of May 11, 1911, P.L. 269, which made both spouses competent to testify to certain facts involving the crime of bigamy. It is quite obvious that the legislature definitely moved in the direction of making competency the rule and incompetency the exception. See Commonwealth v. Clanton, 395 Pa. 521 (1959).

Of further significance is the case of Commonwealth v. Wilkes, 414 Pa. 246 (1964). In that case, the husband-defendant shot and killed his adult son. Both father and son had been engaged in an illegal relationship with another woman. Defendant's wife, who was estranged from, but still married to, defendant, visited her husband's home after the shooting and found certain love correspondence between defendant and the other woman. Though the wife did not testify against her husband, the letters she had obtained

were admitted into evidence for the purpose of showing the relationship existing between defendant, his son and the woman indicating a possible motive for the killing.

The Supreme Court of Pennsylvania held that the wife's delivery of the letters did not amount to her giving evidence against her husband in contravention of 19 PS §683. In so deciding, the court stated:

"Confidential communications between them and facts which have come to their knowledge through the marital relationship cannot be divulged by either without the consent of the other. However, if knowledge thereof is not gained through the relationship and in the confidence which the relationship inspires, it is not privileged. The prohibition against the giving of testimony by one married party against the other is based upon consideration for preserving domestic peace, harmony and the sanctity of the marriage. Obviously, no such consideration precludes the exposure of the evidence involved."

This court is greatly impressed by the result of the *Wilkes* case. Where, upon proven facts, there is little to preserve in a marriage, the rule of incompetency as to a spouse fails. By analogy, therefore, what is left to be preserved in the present case? Consider the circumstances in which Mrs. Cathcart found her husband. Coupled with the fact that defendant attempted to choke his wife after his deed had been discovered, can it be said that defendant committed his crime in the confidence of his wife?

In a learned treatise, Wigmore discusses a most similar situation: 8 Wigmore on Evidence, §2337. Wigmore draws a clear distinction between communications *per se* and communicative acts. For example, Wigmore holds that the marital privilege is clearly inapplicable to a case where the wife, unknown to the

husband, observes him disposing of a dead body in the outhouse. Since the husband did not take the wife into his confidence, Wigmore contends that it would be nonsense for the tribunal to deprive itself of the wife's evidence on the ground that compulsory disclosure in such cases would discourage marital confidence. It is submitted that the clandestine nature of defendant's conduct in the present case negates the confidence referred to in the Wilkes case, which leans decidedly in favor of expanding the competency of a spouse.

Next, and most importantly, reference is made to the statute itself. An analysis of the "minor" provisions of the Pennsylvania statute in question reveals that the legislature was most specific in covering the situation where the minor was the issue of either defendant spouse or the testifying spouse. Yet, it did not stop there but rather continued so as to include "any minor in the care or custody" of a spouse. It is noted that the legislature did not say "legal custody," "temporary care or custody" or "permanent care or custody." It said simply "care or custody." Even applying a strict construction because of the criminal nature of the present case, it is the opinion of this court that the testimony of Mrs. Cathcart was competent testimony in light of the Act of May 23, 1887, P.L. §158. There seems no doubt that the legislature expanded the rule of the competency of a spouse so as to allow the adults who are entrusted with the care and supervision of minors to come forth and speak out when the person of a minor is criminally abused.

We find no merit in any of defendant's contentions. The test of the sufficiency of the evidence is whether, accepting as true all the evidence upon which the jury could have properly based its verdict, such evidence is sufficient in law to prove beyond a reasonable doubt

that defendant is guilty of the crime charged: Commonwealth v. Gockley, 411 Pa. 437; Commonwealth v. Lytes, 209 Pa. Superior Ct. 436. In light of the testimony previously set forth, we find the verdict of guilty was based upon sufficient evidence and not contrary to law.

The contention of defendant that his constitutional right to a speedy trial was violated is without merit. The record shows that the case was presented to the grand jury on March 5, 1970, and a bill of indictment was approved by the grand jury at that time.

The case was listed for trial on March 18, 1970, and it had to be continued because Mr. Davis, who represents defendant, was on trial in a murder case in Philadelphia. It was continued until April 8th and again it had to be continued because Mr. Davis was on another case at that time. That was one term. This is the second term and the case was tried.

Therefore, we enter the following:

### ORDER

And now, to wit, November 20, 1970, it is hereby ordered and decreed that:

1. Defendant's motion for a new trial be and the same is hereby dismissed;

2. Defendant's motion in arrest of judgment be and the same is hereby dismissed;

3. Defendant shall appear for sentencing in Courtroom 3, Courthouse, Media, Pa., on Friday, December 4, 1970, at 10 a.m.